HARDIMAN, APPELLEE, *v.* ZEP
MANUFACTURING CO., APPELLANT.

(No. 46566—Decided April 12, 1984.)
(No. 47259—Decided March 16, 1984.)

*Koplow & Pomerantz Co., L.P.A.,*
and *Mr. Norman S. Pomerantz,* for appellee.

*Nurenberg, Plevin, Jacobson, Heller
& McCarthy Co., L.P.A.,* and *Mr.
Jerome S. Kalur,* for appellant.

NAHRA, J. Plaintiff-appellee, Daniel Hardiman, was employed by the city of Shaker Heights as a sewer worker. On May 23, 1979 he was sent to unclog a sewer line using Zep Super Sewer Aid, a caustic material containing lye. After opening the "test T" (a vertical access line to the main sewer), Hardiman poured in some Zep, the amount he poured being disputed. He was injured when the Super Sewer Aid erupted violently out of the "test T" and splashed him in the face and on the hand.

Hardiman admitted he did not read the warning label on the can of Zep Super Sewer Aid. At the time of the accident he was wearing neither a face shield nor safety goggles, which were recommended on the warning label. Hardiman testified that he had seen others use Zep several times before, and used it the same way he had seen it used. He knew Zep was a dangerous chemical and knew it would burn or injure him if it got on him. He further testified that he had never seen the Super Sewer Aid erupt as it did, and no one ever told him it would react that way.

At trial several witnesses testified concerning the adequacy of the warning on the Zep Super Sewer Aid can, the design of the product, and the manufacturing of the product. Gerald Burks, a safety consultant, testified that the warning label was inadequate in that it failed to warn of the danger of a flashback or eruption out of the sewer, a danger he thought was foreseeable. Burks also thought the directions contained terms that were not specific or clear enough to insure safe use. He also felt the label did not properly set off the "danger" warning, as it did not comply with the American National Standards for "danger" warnings.

Dr. Ralph Dannley, a retired chemistry professor at Case Western Reserve University, testified that the hydrogen gas given off when Zep reacted was not a desirable by-product. According to Dannley, the hydrogen gas could be sharply reduced or eliminated without affecting the product's performance if a different ratio of sodium nitrate to aluminum was used. He said that there could be some separation and settling of the Zep mixture when shipped, and that "pelletization" or "chunking" the mixture would avoid this problem. He also said pelletization would be a safety feature because it would result in a longer reaction time. Dannley felt visual inspection of the final product, which was utilized by Zep's workers, was not sufficient, and that some testing of the final mixture was necessary. Based on the chemical composition of Zep Super Sewer Aid, Dannley thought the company could foresee a flashback or eruption reaction.

Dr. Manuel Fineman, the vice-president of research and development for Zep Manufacturing Company, offered testimony that the label was adequate and the product properly designed and manufactured. Dr. Fineman's position was that this sewer cleaner, because it was required to generate a great deal of heat to accomplish its purpose of opening clogged sewers, was a dangerous product but could be used safely if the directions on the label were followed and the safety precautions suggested were utilized. Due to the variations in pipe size, type of obstruction and location of the obstruction, the company could not specify the exact quantity of product to be used, but it did provide guidelines which would enable trained personnel to use Zep safely. Fineman felt Hardiman's training was inadequate.

Dr. Fineman testified that the different material in Zep will not separate out. He believes Zep has complied with the American National Standards Institute's (ANSI) warning guidelines for caustic materials. Based on ANSI guidelines, Zep Manufacturing tried to put only the most critical information for safe use on the Zep Super Sewer Aid can, while providing additional information and directions in their technical data report. Zep's label did comply with the criteria established by the Manufacturer's Chemical Association. He also took exception to Dr. Dannley's experiment showing the production of hydrogen gas. Dr. Fineman contended that with Zep's product ammonia gas is produced in large amount, not hydrogen, and only by using a misleading experiment did Dannley show hydrogen gas being produced in large amounts.

The jury returned a verdict for plaintiff for $250,000. Defendant submitted three interrogatories asking the jury, if they found Zep Super Sewer Aid to be unreasonably dangerous, to state whether the defect was inadequate warning or design defect and how it was defective or inadequate. The jury said the product should be pelletized to reduce[1] reaction time and should be tested by other than visual means. They found the warnings inadequate, saying the word "Danger" should be isolated on a separate label, the rate and amount of product to be used should be more clearly specified, and the label should give warnings in picture form about such possible hazards as flashback.

---

[1] All the testimony offered at trial concerning pelletization indicated such a process would slow down the rate of reaction or increase (lengthen) reaction time. We believe the jury simply used the incorrect term in referring to the effect on reaction time from pelletization and are proceeding on that basis.

Plaintiff's motion for prejudgment interest was granted following a hearing.

On appeal, cases 46566 and 47259 are consolidated, and contain seven assignments of error.

1. "The trial court erred in failing to direct a verdict upon the alleged defect of inadequate warning."

This error has no merit, as it misstates what actually occurred at trial. Ohio does not recognize a strict liability cause of action arising from allegations of inadequate warning. *Knitz* v. *Minster Machine Co.* (1982), 69 Ohio St. 2d 460 [23 O.O.3d 403]; *Temple* v. *Wean United, Inc.* (1977), 50 Ohio St. 2d 317 [4 O.O.3d 466]. See, also, *Overbee* v. *Van Waters & Rogers* (C.A.6, 1983), 706 F.2d 768. In *Knitz,* at 466, fn.5, the court said:

"* * * As we pointed out in *Temple,* at page 325, '[i]t is * * * apparent that the rule imposing obligation on the manufacturer or seller to give suitable warning of a dangerous propensity of a product is a rule fixing a standard of care, and *any tort result from the failure to meet this duty is, in essence, a negligent act.'* * * *

"Moreover, we held in *Leichtamer* [v. *American Motors Corp.* (1981), 67 Ohio St. 2d 456 (21 O.O.3d 285)], at page 469, that '[t]he absence of a warning does not, without more, provide a basis for [strict] liability; rather, evidence of warning is in the nature of an affirmative defense to a claim that a product is unreasonably dangerous.' " (Emphasis added.)

In plaintiff's amended complaint, he made both a negligence and strict liability claim based on inadequate warning. Defendant moved for a directed verdict on the grounds of negligence, but plaintiff admitted he had withdrawn his negligence claim. Since inadequate warning is not a cause of action under strict liability, and since the negligence claim was withdrawn, there was no cause of action of inadequate warning before the jury. There was no need to direct a verdict on a claim that was not at issue, and the judge instructed the jury that negligence was not at issue.

The issue of the adequacy of the warning label was before the jury only as an affirmative defense to plaintiff's claim that Zep Super Sewer Aid was unreasonably dangerous, and the jury was so instructed. Based on the evidence presented, the jury could have properly found that the product, even if the label warnings and directions were followed, was not safe for use. The jury's verdict showed it rejected defendant's defense of adequate warning, and the interrogatories which explain the inadequacies of the warning label are consistent with a rejection of an adequate warning defense.

Because inadequate warning sounds only in negligence, and the negligence claims were withdrawn by plaintiff, there was no need to direct a verdict on inadequate warning since there was no inadequate warning cause of action before the jury.

2. "The trial court erred in failing to direct a verdict upon the claim of defective design."

A motion for a directed verdict should be granted only when:

"* * * the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party * * *." Civ. R. 50(A)(4).

There was evidence and testimony presented which indicated that Zep

Super Sewer Aid may have had a design defect, and that the design defect may have proximately caused plaintiff's injuries.[2] Since reasonable minds could differ as to whether there was a design defect which proximately caused plaintiff's injuries, a motion for a directed verdict was properly overruled and the issue submitted to the jury.

3. "The trial court erred in refusing to submit the issue of intervening cause to the jury."

Civ. R. 51(A) states in part:

"A party may not assign as error the giving or the failure to give any instruction unless he objects thereto before the jury retires to consider its verdict, stating specifically the matter to which he objects and the grounds of his objection."

In objecting to the judge's failure to give its fourth and sixth requested charges, defendant simply said:

"* * * [W]e object to the failure to give the fourth suggested charge dealing with intervening cause; * * * We object to the failure to give the sixth charge dealing with the safe place to work statute 4101.11 of the Ohio Revised Code."

This does not satisfy Civ. R. 51(A)'s requirement that the grounds for an objection be stated, and would present nothing for our review. *Singfield* v. *Thomas* (1971), 28 Ohio App. 2d 185 [57 O.O.2d 268]. Although appellant may not have complied with Civ. R. 51(A), we have nonetheless addressed the issue to its requested charges.

Appellant contends that its requested fourth charge[3] should have been given to the jury. Where a requested charge does not correctly state the law, the court is not required to give that charge. *Pallini* v. *Dankowski* (1969), 17 Ohio St. 2d 51 [46 O.O.2d 267]. Because the requested charge did not accurately state the law, we find it was properly not submitted to the jury.

The charge would allow the jury to find Shaker Heights, plaintiff's supervisor Bobo or the plaintiff himself to be an intervening cause. The term "intervening cause" generally contemplates action by a third party other than plaintiff or defendant. A charge that would allow a jury to find plaintiff's conduct to be an intervening cause is equivalent to charging on contributory negligence. However, contributory negligence is not a defense to a strict liability claim. 2 Restatement of the Law 2d, Torts (1965) 356, Section 402A, Comment N. Section 402A, together with its numerous illustrative comments, was adopted as the law in Ohio in *Temple* v. *Wean United, supra.*

---

[2] Appellant insists the failure to read the warning label would prevent the design defect, if one existed, from being the proximate cause of plaintiff's injuries. This position assumes the warnings, if followed, were adequate for safe use, an issue the jury considered and apparently rejected when it rejected appellant's defense of adequate warning. See 2 Restatement of the Law 2d, Torts (1965) 353, Section 402A, Comment J.

[3] The requested fourth charge reads:

"Where there intervenes between an agency creating a hazard and an injury resulting from such hazard, another conscious and responsible agency which could or should have eliminated the hazard, the original agency is relieved from liability. A break in the chain of causation thereby takes place which operates to absolve the original agency.

"As applied to the fact of this case, if you find that the City of Shaker Heights, its employees or agents, or Plaintiff Hardiman were intervening and responsible entities which could or should have eliminated the claimed initial hazard, then you must find that a break in the chain of causation occurred and your verdict must be in favor of defendant."

Appellant also contends that its sixth requested charge[4] should have been given. We find no authority for appellant's proposition that the "safe-place-to-work" statute is a defense to a Section 402A strict liability cause of action. We do not believe the legislature intended either R.C. 4101.11 or 4101.12 to shield manufacturers from possible liability resulting from defective products. The instruction was properly refused.

4. "The jury verdict is contrary to the weight of the evidence."

In dealing with a claim that the judgment is against the manifest weight of the evidence, a reviewing court can reverse only if:

" '[T]he verdict is so manifestly contrary to the natural and reasonable inferences to be drawn from the evidence as to produce a result in complete violation of substantial justice, * * *.' " *Royer* v. *Bd. of Edn.* (1977), 51 Ohio App. 2d 17, 20 [5 O.O.3d 138], citing *Jacobs* v. *Benedict* (1973), 39 Ohio App. 2d 141 [64 O.O.2d 355].

There was credible evidence presented at trial which supports the verdict rendered, and that verdict cannot be characterized as a violation of substantial justice.

The credibility of witnesses, the weight to be given their testimony, and the resolution of conflicts in the evidence are questions of fact for the jury. A reviewing court should not substitute its judgment for that of the jury and we see no need to do so here.

5. "The trial court erred in permitting the jury to segregate injury that would have been caused if goggles and not a face mask had been worn."

The label on Zep Super Sewer Aid said that, when using the product, one should wear goggles or a face shield. The judge instructed the jury that if they found the product to be defective, they could award damages for injuries to plaintiff's eyes, his face or both.[5] Appellant contends this represented an irrelevant inquiry since plaintiff did not read the label and wore neither goggles nor a face shield.

We fail to see how the charge harms appellant. In fact, it appears to benefit appellant. It would allow the jury to find that the Super Sewer Aid, if found defective, was not the proximate cause of all of plaintiff's injuries. It would permit the jury to assess damages as if plaintiff had worn the goggles as recommended. The label on Zep Super Sewer Aid suggested a user wear goggles *or* a face shield; it did not say only a face shield. The instruction would permit the jury to assess damages as if plaintiff had used the minimum safety equipment suggested on appellant's label, an assumption we feel does no harm to appellant but rather works to its benefit by

---

[4] The requested sixth charge reads:

"§ 4101.11 of the Ohio Revised Code imposed an obligation upon Mr. Hardiman's employer, the City of Shaker Heights, to furnish him with a safe place to work. In the event you find that his employer violated the safe place to work requirements and that that violation was the proximate cause of Mr. Hardiman's injuries, then your verdict must be for the defendant."

[5] The portion of the requested charge at issue is:

"Plaintiff Daniel Hardiman contends that the unreasonably dangerous or defective nature of Zep Super Sewer Aid proximately caused injury to his eyes and to his face. If you find that the product was unreasonably dangerous or, that is, defective in nature, it does not necessarily follow that this must be the proximate cause of all of the plaintiff's injuries. You may award damages to reflect injury to either his eyes or his face, or both, depending on whether you are satisfied that the unreasonable danger, that is, defect, was the proximate cause of the plaintiff's injuries."

possibly reducing its damages exposure. We find this charge to be an appropriate instruction on proximate cause and thus unobjectionable.

6. "§ 1343.03 of the Revised Code is unconstitutional."

Appellant contends that R.C. 1343.03(C),[6] which allows a judge to award prejudgment interest where he finds a lack of a good faith effort to settle the case, is unconstitutional because it penalizes a party for exercising his right to a trial and allows the judge, rather than a jury, to determine if there was a lack of good faith.

All legislative enactments are cloaked with a presumption of constitutionality. *State* v. *Dorso* (1983), 4 Ohio St. 3d 60. Thus, since appellant is challenging the constitutionality of R.C. 1343.03(C), it has the burden of clearly showing the statute is invalid. We find it has failed to do so.

Section 5, Article I of the Ohio Constitution provides that "[T]he right of trial by jury shall be inviolate * * *." However, this right to a jury trial is guaranteed only in those cases where a jury trial existed before the Constitution was adopted. *Pokorny* v. *Local No. 310* (1974), 38 Ohio St. 2d 177 [67 O.O.2d 195]. Appellant has not demonstrated to us that a jury right existed at common law for the assessment of interest on a judgment. Therefore, its reliance on Section 5, Article I is misplaced. Nor, as appellant asserts, is an award of prejudgment interest under R.C. 1343.03 (C) the equivalent of, or in the nature of, a common law tort action for fraud, oppression or actual malice such that a

trial is required as it is for those causes of action. The prejudgment interest issue is rather a collateral matter to the tort action, more akin to an award of attorney fees, which does not require a jury trial, even though a monetary award is involved. We find nothing in appellant's argument to support its contention that the issue of lack of good faith must be presented to a jury. The judge at trial who is familiar with the case, the issues, and the parties, and who has had the opportunity to observe the progress and conduct of the case, is capable of determining if either party has failed to make a good faith effort to settle the case. Appellant has demonstrated no constitutional grounds which justify overturning the legislature's determination that a judge, not a jury, should decide the good faith issue.

Additionally, R.C. 1343.03(C) does not penalize those who choose to go to trial; it only affects those who choose to go to trial and then abuse the trial process, those who fail to conduct a lawsuit in good faith. Appellant concedes that the legislature could constitutionally impose prejudgment interest for all tort judgments. While it could do that, the legislature is not required to act to the full extent of their powers, which is what they appear to have done with R.C. 1343.03(C). The statute does not grant prejudgment interest in all cases, only where one party has failed to make a good faith effort to settle. Those who act in good faith are relieved from a prejudgment interest assessment; while those who fail to act in good faith are subject to prejudgment interest. Thus

---

[6] R.C. 1343.03(C) provides: "Interest on a judgment, decree, or order for the payment of money rendered in a civil action based on tortious conduct and not settled by agreement of the parties, shall be computed from the date the cause of action accrued to the date on which the money is paid, if, upon motion of any party to the action, the court determines at a hearing held subsequent to the verdict or decision in the action that the party required to pay the money failed to make a good faith effort to settle the case and that the party to whom the money is to be paid did not fail to make a good faith effort to settle the case."

R.C. 1343.03(C) acts as a *restriction* on the power of a court to grant interest, and tortfeasors who do make good faith efforts to settle benefit, since lack of good faith is a prerequisite to granting the interest.

A court has broad powers to control judicial proceedings and enforce sanctions against those who abuse the judicial system. It would be unconstitutional to penalize a party for exercising his right to a trial. It is not unconstitutional to penalize or impose sanctions on one who abuses procedural guidelines which are concomitant with a right to jury trial. It is not unconstitutional to prevent a party from receiving a benefit where that party fails to act in good faith in a procedure designed to resolve cases before trial and thus expedite the right to trial for those cases that cannot be settled by mutual agreement. We do not see how R.C. 1343.03(C) penalizes a party's right to a jury trial. Unless one fails to act in good faith, no prejudgment interest can be awarded. If one fails to act in good faith, he cannot be heard to complain that he did not receive the benefit the legislature decided to give to those who make a good faith effort to settle.[7]

7. "The trial court's finding of bad faith is not supported by the evidence."

R.C. 1343.03(C) allows prejudgment interest to be awarded where the liable party "failed to make a good faith effort to settle the case." Appellant wrote only one letter to appellee, stating that appellant felt it was not liable, but indicating it would be willing to talk. Appellee responded by saying that the value of the case was $750,000. No other steps toward settlement took place until the trial was underway.

We do not believe this is the proper case to delineate what "failed to make a good faith effort to settle" entails or requires. The minimal efforts to settle made by both sides are essentially equivalent. Therefore if appellant's conduct is considered a failure to make a good faith effort to settle, we believe appellee also failed to make a good faith effort to settle. Conversely, if appellee's actions are sufficient so that he did not fail to make a good faith effort to settle the case, then appellant, having acted in an essentially equivalent manner, also did not fail to make a good faith effort to settle. Whichever approach is taken, based on the facts of this case and according to the requirements of R.C. 1343.03(C), it was improper to award prejudgment interest to appellee.[8]

The decision of the lower court is affirmed in part and reversed in part.

---

[7] We note further that even if appellant was entitled to have a jury determine if prejudgment interest was appropriate, it waived that right by failing to request a jury, as it admits, until after the hearing, in a post-hearing brief. Civ. R. 39(B).

[8] Appellant also raised the issue of the proper rate of interest to be applied, if prejudgment interest is appropriate. Interest at ten percent was awarded by the lower court. The statutory rate under R.C. 1343.03 was six percent until July 30, 1980; eight percent from July 31, 1980 to July 4, 1982; and ten percent from July 5, 1982 to the present. Plaintiff's injuries occurred on May 23, 1979. The judgment was entered on February 16, 1983. R.C. 1343.03(A) states simply that "upon all judgments * * * of any judicial tribunal for the payment of money arising out of tortious conduct * * * the creditor is entitled to interest at the rate of ten percent per annum, and no more * * *."

Appellant contends the rate then in effect should apply, so that parts of plaintiff's prejudgment interest would be at six percent, eight percent and ten percent. Appellee contends that ten percent should apply for the entire period. We believe the rate then in effect should apply, as giving a full ten percent from the date the cause of action accrued would result in a windfall to plaintiff, and we do not believe such was intended by the legislature. The policy behind prejudgment interest is to make the plaintiff whole. Thus prejudgment interest gives him interest from the date the tort occurred, making it as if

*Judgment affirmed in part and reversed in part.*

PRYATEL, J., concurs in judgment only.

JACKSON, P.J., dissents.

JACKSON, P.J., dissenting. Respectfully, I dissent from the decision of the majority affirming the judgment of the trial court awarding plaintiff damages in the amount of $250,000.

The presence of an adequate warning is a defense to a claim of strict tort liability.[9] *Leichtamer* v. *American Motors Corp.* (1981), 67 Ohio St. 2d 456 [21 O.O.3d 285]. The warning on the can of drain cleaner states in large print,

"DANGER! CAUSES SEVERE BURNS"

In smaller print, directions for use and precautions are addressed to the user. The user is advised to use forty to sixty pounds in smaller lines and up to one hundred pounds in larger lines, to keep hands and face away from the drain when using, to add the drain cleaner "slowly" to avoid "violent spattering," and to wear goggles or a face shield. The user is further advised that the product was designed exclusively for industrial and institutional use by trained personnel, and that the label directions must be followed exactly.[10]

---

plaintiff received his damages on that date and had the use of the damages from the date of the tort. Had plaintiff received his money on May 23, 1979, he could not have gotten ten percent interest by statute. To make a plaintiff whole without giving him an undeserved windfall, we believe prejudgment interest should be calculated as the statutory rate in effect during the period in question. Accord *Porter* v. *Clerk of Superior Court* (1975), 368 Mass. 116, 330 N.E. 2d 206.

[9] Such claims are based upon the provisions of 2 Restatement of the Law 2d, Torts (1965) 347-348. Section 402A, and the comments thereto, were incorporated into Ohio law by the Supreme Court in *Temple* v. *Wean United, Inc.* (1977), 50 Ohio St. 2d 317 [4 O.O.3d 466]. Section 402A provides:

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

"(a) the seller is engaged in the business of selling such a product, and

"(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

"(2) The rule stated in Subsection (1) applies although

"(a) the seller has exercised all possible care in the preparation and sale of his product, and

"(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

[10] The label is retyped below:

"DIRECTIONS

"Introduce into drain or sewer line in dry form. Quantity to be used will depend upon size of line (diameter and length from point of entry to point of obstruction). For small lines, use 40 to 60 pounds; for larger lines, use up to 100 pounds, introducing in two or three increments at different points along the line. For specific quantity instructions, refer to Technical Data Report No. 277.

"DANGER! CAUSES SEVERE BURNS KEEP OUT OF REACH OF CHILDREN

"Harmful or fatal if swallowed. Contains Sodium Hydroxide. Careless use can cause severe burns to skin and eyes. Avoid contact with skin, eyes, and clothing. When handling, wear goggles or face shield. Keep hands and face away from drain when using. Add slowly to drain to avoid violent spattering. USE COLD WATER ONLY.

"DO NOT ADD TO HOT WATER. In case of contact, remove contaminated clothing and shoes and wash before re-using. Immediately flush skin with plenty of water. For eyes, flush with plenty of water for at least 15 minutes and call a physician.

"This product may pick up moisture from the air which decreases its activity. When not in use, close and reseal plastic bag in the

The appellee testified that he could read "very little," and that the only part of the label that he read before using the product was the word "ZEP." He had learned how to use the product by watching his boss (and possibly other employees) pour it into sewer drains. None of the persons whom he observed ever wore goggles.[11]

Appellee was sent alone by his supervisor to unclog a sewer at a church on Warrensville Center Road. Appellee's supervisor testified that the city of Shaker Heights had been using the product for eleven years, apparently without incident, and they were still using it. They had stopped taking the precautions recommended on the label of the product because they felt it was a "safe" product.

The jury found this warning to be inadequate because the word "Danger" was not on a separate label, because the label did not contain warnings in picture form and because the rate and amount of drain cleaner to be used was allegedly not sufficiently specific.

In my considered opinion the label does constitute an adequate warning, as a matter of law.[12] The issue is not whether the warning is susceptible to improvement, but whether it was *adequate* under the circumstances. The danger of "flashback" or "violent spat-tering" is an obvious one to persons familiar with cleaning drains with a product which creates heat. But even to a person unfamiliar with this phenomenon, the label provides adequate warning, and demands the user to take adequate precautions: to pour slowly, to keep hands and face away from the drain, and to wear protective face gear. Any manufacturer that produces a product which can be safely and effectively utilized only if certain instructions are followed, need not assume that the users of its product cannot read, as the evidence demonstrates was the circumstance in the case at bar.

I am persuaded that under the posture of the evidence herein the appellant should not be held liable for the appellee's personal injuries.

Furthermore, as to a procedural point made by the majority in disposing of the appellant's third assigned error, it is my considered opinion that the appellant adequately preserved its right to appeal the refusal of the trial court to give its fourth and sixth requested jury instructions. The majority finds that counsel for appellant did not preserve an objection to the charge of the court, because counsel did not "state specifically the matter to which he objects" as required by Civ. R. 51(A). Counsel stated, after the instructions were given, that

---

large containers and close lid tightly, avoiding undue exposure to air.

"FOR INDUSTRIAL AND INSTITUTIONAL USE ONLY.

"ZEP MANUFACTURING COMPANY

"Division of National Service Industries, Inc.

"ATLANTA, GEORGIA 30301

"PRINCIPAL CITIES, USA AND THROUGHOUT THE WORLD

"This product is designed exclusively for industrial and institutional use by trained, professional maintenance personnel. Label directions and precautions must be followed exactly. Zep Manufacturing Company will not be responsible for any injury, loss or damage, if product is used in any manner not in compliance with label directions or if precautions are not observed."

[11] Any liability of the appellee's employer, the city of Shaker Heights, is governed by the Workers' Compensation Act. R.C. Chapter 4123. Employers are immune from suit in civil proceedings pursuant to R.C. 4123.74. Workers' compensation benefits are awarded to employees in lieu of civil damages.

[12] The Supreme Court has held that a strict liability suit may be determined on summary judgment, as a matter of law, under proper circumstances. *King* v. *K. R. Wilson Co.* (1983), 8 Ohio St. 3d 9.

his client objected to the failure of the court to read to the jury its fourth and sixth suggested charges, which had been submitted in writing to the court. The first paragraph of the syllabus in the case of *Presley* v. *Norwood* (1973), 36 Ohio St. 2d 29 [65 O.O.2d 129], states:

"Where the record affirmatively shows that a trial court has been fully apprised of the correct law governing a material issue in dispute, and that the complaining party has unsuccessfully requested the inclusion of that law in the trial court's charge to the jury, such party does not waive his objections to the court's charge by failing to *formally* object thereto. * * *"

The appellant need not object to the failure of the court to read a requested charge. Consequently, the appellant preserved the right to appellate review of the decision of the court not to charge on the requested issues.

Nevertheless, I agree with the majority that the appellant's requested jury instructions were not a correct statement of the law as applied to the facts developed at trial, and that the trial court did not err in refusing to give the requested instruction.

In my considered opinion the decision of the trial court should be reversed on the ground that the manufacturer's printed warning on its product was adequate as a matter of law.