774 F.2d 1163
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
St. Paul Fire & Marine Insurance Company, Plaintiff-Appellee
Cross-Appellant,
v.
Continental Casualty Company, Defendant-Appellant Cross-Appellee.
 Nos. 84-5384, 84-5622
 United States Court of Appeals, Sixth Circuit.
 9/13/85
 
 E.D.Ky.
 AFFIRMED
 ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF KENTUCKY
 BEFORE: ENGEL and KRUPANSKY, Circuit Judges; and HULL, Chief District Judge.[1]
 KRUPANSKY, J.
 
 
 1
 Defendant Continental Casualty Co. (CNA) appealed the district court's declaratory judgment which concluded that plaintiff, St. Paul Fire & Marine Insurance Company (St. Paul), was entitled to recover monetary damages from CNA due to CNA's failure to contribute to the settlement of claims against their joint-insured, the accounting firm of Louis F. Schott & Associates (Schott). Specifically, CNA challenged the method of apportionment between St. Paul, the primary insurer, and CNA, the excess insurer; St. Paul's subrogation to Schott's rights against CNA; the finding that St. Paul did not act as a volunteer; the finding that CNA acted in bad faith; and the application of pre-judgment interest. St. Paul cross-appealed the district court decision solely on the amount of contribution owed by CNA.
 
 
 2
 Appellant St. Paul was the primary carrier for a professional liability policy issued to Schott. St. Paul's annual policy limits were $300,000. Appellee CNA was the excess carrier with annual policy limits of $1,000,000 for claims exceeding $300,000. As a result of claims arising out of complex bankruptcy and securitiesproceedings,[2] Schott was named along with various other defendants and charged with professional malpractice in the performance of his accounting duties.
 
 
 3
 The claims against Schott were settled for $887,500 paid by St. Paul. Although invited on a number of occasions, CNA did not participate in any settlement proceedings. CNA did, however, urge St. Paul to settle the Schott litigation and promised that CNA would fulfill its obligations pursuant to its excess carrier policy. CNA subsequently refused to contribute to the settlement, and St. Paul sought a declaratory judgment to determine the extent of CAN's liability. The trial court concluded that (1) St. Paul was rightfully subrogated to Schott's rights against CNA for $139,287.50, based on a proration of the settlement amount in proportion to the amount of potential claims in each of three policy years; (2) CNA was estopped from claiming that St. Paul acted as a volunteer in satisfying the full settlement amount; (3) CNA acted in bad faith in its dealings with St. Paul; and (4) pre-judgment interest was payable to St. Paul on the amount of CNA's ordered contribution.
 
 
 4
 Appellant CNA first alleged that the district court erred in apportioning the settlement between St. Paul as primary and CNA as excess carrier because St. Paul's settlement of the litigation had not exceeded its policy limit, which was a condition precedent for CNA's excess insurer liability.
 
 
 5
 In considering CNA's liability, the court first determined that St. Paul and CNA had contingent liability for claims arising against Schott during three policy years: May 1, 1969 to May 1, 1970; May 1, 1970 to May 1, 1971; May 1, 1971 to May 1, 1972.[3] Schott's potential liability for the three year period totalled $1,921,196.
 
 
 6
 Although the trial court acknowledged that some claims were more meritorious than others, it nevertheless abstained from assigning relative worth to each of the claims and treated them with 'equal dignity.' In addition, the final settlement was contingent upon the release of all outstanding claims, regardless of their merits.[4]
 
 
 7
 In calculating CNA's liability, the district court divided the total exposure for each applicable year by the aggregate exposure for the three-year period and determined the percentage of each individual year's exposure to the total. The court then prorated the final settlement figure to each of the applicable years. For example, Schott's total exposure or potential damages for the policy year 1970-71 was $794,001.65, which the court divided by the aggregate exposure of $1,921,196 for the applicable three-year period. The $794,001.65 represented 41.3% of Schott's three year exposure, and 41.3% of the settlement figure of $887,500, or $366,537.50, represented his dollar liability for that given period. Thus, for the 1970-1971 policy, CNA's liability was the amount in excess of St. Paul's $300,000 coverage, i.e., $66,537.50. In sum, the lower court computed that St. Paul did not meet its policy limit in 1969-70, and therefore CNA's excess coverage was not invoked. In 1970-71, Schott's liability totalled $366,537.50, and in 1971-72 it totalled $372,750. The total excess figure for those two years, therefore, was $139,287.50, which CNA was ordered to reimburse St. Paul. The district court's distribution reflected the reality of three separate settlements, one for each policy year invoked.
 
 
 8
 CNA objected to the lower court's computations and urged that because there were valid claims exceeding St. Paul's coverage each year, and St. Paul had settled for less than its aggregate figure of $900,000, the primary policy limits had not been exhausted, and no excess coverage had been invoked. However, CNA should not be permitted to interchangeably rely first on the potential claim figure and then on the actual settlement figure, employing them alternatively when it was advantageous to its position. Neither should it be permitted to argue that each policy year should be treated as a separate period when it was advantageous to CNA to invoke St. Paul's annual policy limit, and subsequently to combine all three years and to urge that the aggregate risk figure of $900,000 had not been exhausted.
 
 
 9
 Evidencing a much more logical approach, and one in keeping with the Supreme Court's pronouncement in Lemon v. Kurtzman, 411 U.S. 192, 93 S.Ct. 1463, 36 L.Ed.2d 151 (1973), that 'equitable remedies are a special blend of what is necessary, what is fair, and what is workable,' Id. at 200, 93 S.Ct. at 1469, this court concludes that the district court correctly utilized the final settlement figure of $887,500 and apportioned the amount over the three applicable policy years in proportion to the percentage of potential claims in each of the years. The policy payout figures determined by the court reflected St. Paul's limit of liability, and the excess payment due from CNA. Damages were equitably apportioned and this court finds no abuse of discretion in the district judge's method of determining liability.
 
 
 10
 St. Paul's cross-appeal disputing the method of apportionment and final liability figure assessed against CNA likewise is without merit. St. Paul argued that the insured's liability in the Harmony Loan litigation should have been limited to the sale of the 9% and 10% debentures because there was a 'remarkable consensus' that these were the strongest and most valid claims. By prorating the settlement figure between the two years in which these transactions occurred, rather than between the three year period to which the court prorated the figures, CNA's total liability would have been increased from the $139,287 determined appropriate by the lower court to a proposed figure of $287,500.
 
 
 11
 This court is of the opinion that the district court properly concluded that the settlement could not be limited to claims arising only in the two policy years connected with the issuance of the 9% and 10% debentures. Even though it was agreed that these claims were perhaps the most meritorious, the court rightly refused to speculate as to which claims would prevail if the case had proceeded to trial.
 
 
 12
 Contrary to CNA's argument that the district court failed to distinguish between primary and excess insurance coverage, the record disclosed that the lower court carefully calculated the percentage of liability in each policy year, subtracted St. Paul's $300,000 policy limit, and only assessed CNA for the excess amount in each of the two years in which the primary carrier's policy limits were exhausted. This court concludes that the district court's allocation of liability was in accordance with established principles and should be upheld.
 
 
 13
 Two additional issues on appeal involve the district court's conclusion that CNA acted in bad faith and the award of pre-judgment interest to St. Paul. 'Bad faith' has been defined in Ohio as follows:
 
 
 14
 A lack of good faith (the equivalent of bad faith) requires more than bad judgment or negligence. Rather, it imports a dishonest purpose, conscious wrongdoing or breach of a known duty based on some ulterior motive or ill with in the nature of fraud.
 
 
 15
 Centennial Ins. Co. v. Liberty Mut. Ins. Co., 62 Ohio St. 2d 221, 224, 404 N.E.2d 759, 762 (1980), citing Slater v. Motorists Ins. Co., 174 Ohio St. 148, 187 N.E.2d 45 (1962); Ware v. Rickey, 14 Ohio App.3d. 3, 469 N.E.2d 899, 905 (1983).
 
 
 16
 Ohio law also clearly recognizes the duty of an insurer to act in good faith. See, e.g., Hoskins v. Aetna Life Ins. Co., 6 Ohio St.3d 272, 452 N.E.2d 1315, 1319 (1983); Netzley v. Nationwide Mutual Ins. Co., 34 Ohio App.2d 65, 296 N.E.2d 550, 558-59 (1971); Hart v. Republic Mut. Ins. Co., 152 Ohio St. 185, 87 N.E.2d 347, 349 (1949).
 
 
 17
 The unique vantage point of the trial judge in ascertaining bad faith is well established. As stated in Hardiman v. Zep Mfg. Co., 14 Ohio App.3d 222, 470 N.E.2d 941 (1984):
 
 
 18
 The judge at trial who is familiar with the case, the issues, and the parties, and who has had the opportunity to observe the progress and conduct of the case, is capable of determining if either party has failed to make a good faith effort to settle the case.
 
 
 19
 470 N.E.2d at 947.
 
 
 20
 The district court concluded that CNA made no effort to participate in the final settlement negotiations, analyze issues in dispute such as relevant policy years, or generally aid its insured. The trial judge also noted the 'arbitrary' and 'off-the-wall' figure of $75,000 proffered by CNA during negotiations. This court concludes that evidence of CNA's conduct presented a substantial basis upon which the district court could find bad faith.
 
 
 21
 CNA also charges error to the trial court for its award of pre-judgment interest.[5] It is well established that pre-judgment interest is generally within the discretion of the court. See Shatterproof Glass Corp. v. Libbey-Owens-Ford Co., 482 F.2d 317, 324 (6th Cir. 1973), cert. denied, 415 U.S. 918, 94 S.Ct. 1417, 39 L.Ed.2d 473 (1974); Walker v. Continental Life & Accident Co., 445 F.2d 1072, 1076 (9th Cir. 1971); Reiss Steamship Co. v. United States Steel Corp., 427 F.2d 1152 (6th Cir. 1970); Abell v. Anderson, 148 F.2d 372, 375 (6th Cir. 1945); Cincinnati Ins. Co. v. First Nat. Bank of Akron, 63 Ohio St.2d 220, 407 N.E.2d 519, 523 (1980). After reviewing the record in this case, the court concludes that there was no abuse of discretion in awarding pre-judgment interest.
 
 
 22
 The two remaining issues on appeal involve challenges to the district court's determination that St. Paul was subrogated to any rights of Schott against CNA, and its finding that St. Paul did not act as a volunteer. This court finds these claims without merit.
 
 
 23
 In view of the foregoing, the lower court correctly concluded that defendant must contribute to the final settlement figure in the amount specified and determined by the court. The lower court's decision does not represent an abuse of discretion, and is hereby AFFIRMED.
 
 
 
 [1]
 Hon. Thomas G. Hull, Chief Judge, United States District Court for the Eastern District of Tennessee, sitting by designation
 
 
 [2]
 Harmony Loan Company, a Newport, Kentucky financial institution, was accused of wrongdoing arising out of various fraudulent credit practices and was subsequently placed in involuntary bankruptcy. A securities fraud class action suit was initiated against the principals of Harmony Loan Company. Schott & Associates, accountants for Harmony, was named a party to the litigation on the basis of its alleged participation in the preparation of fraudulent financial statements and securities filings
 
 
 [3]
 The Harmony Loan class action plaintiffs sought to extend Schott's liability to all securities sold by Harmony Loan, including those issued before Schott & Associates was retained as Harmony's accounting firm. This liability was premised on Schott's previous position as a partner in H.L. Willig & Company, an accounting firm which performed public accounting services for Harmony Loan Company from its inception until 1967. However, the lower court restricted Schott's insurers' liability to the three year period in which Schott & Associates prepared financial prospectuses for the sale of 7%, 9%, and 10% debentures and B common stock. The lower court concluded that only claims resulting from those transactions were 'proved by credible evidence and the proper means of assigning them to the various policy years.'
 
 
 [4]
 The court below viewed as significant the fact that the settlement funds were distributed to the Harmony plaintiff class across the board on all claims relating to the 7%, 9%, and 10% debentures and B common stock. It further noted that Judges Hogan and Lee, who presided over the settlement negotiations, approved this manner of distribution
 
 
 [5]
 Although the court applied Kentucky, rather than Ohio law in determining the applicability of pre-judgment interest, the laws of the two states are not in conflict as to when pre-judgment interest is appropriate. CNA challenges only whether pre-judgment interest was properly awarded