HARRELL et al., Appellees and Cross–Appellants,

v.

CRYSTAL et al., Appellants and Cross–Appellees.

[Cite as *Harrell v. Crystal* (1992), 81 Ohio App.3d 515.]

Court of Appeals of Ohio,
Cuyahoga County.

No. 60765.

Decided June 29, 1992.

516

*Rosenzweig, Schulz & Gillombardo Co., L.P.A., Isaac Schulz, Patricia S. Kleri* and *Susan H. Abramson,* for appellees and cross-appellants.

*Reminger & Reminger Co., L.P.A., Roy A. Hulme* and *Margaret M. Gardner,* for appellants and cross-appellees.

BLACKMON, Judge.

## I

Appellants, Larry Crystal and the law firm of McCarthy, Lebit, Crystal & Haiman Co., L.P.A., in which Crystal is a partner, appeal from the judgment of the Cuyahoga County Court of Common Pleas which denied their motion for judgment notwithstanding the verdict or, in the alternative, a new trial. Appellants' motion resulted from a complaint filed by appellees, Edd and Tincie Harrell, alleging professional negligence, breach of contract and breach of fiduciary duty. Appellees also cross-appeal from the same judgment. The jury returned a verdict for appellees. The parties had stipulated that the court would rule on the measure of damages using the stipulated figures to calculate the actual award.

The trial court entered a judgment for appellees in the amount of $182,000 on May 15, 1990. On June 6, 1990 the trial court rendered a judgment nunc pro tunc adding $75,606 to the original judgment for a total of $257,606,

stating that the added figure was erroneously deleted from the previous entry. For the reasons that follow, we affirm both appeals.

## II

Larry Crystal is an attorney licensed to practice law, since 1965, in the state of Ohio. His practices are in the area of tax and business law. Crystal is a partner in the law firm of McCarthy, Lebit, Crystal & Haiman Co., L.P.A.

In 1975, Edd Harrell bought the winning ticket to an Irish sweepstakes.[1] He contacted David Katz, an attorney who once prepared the Harrells' will, requesting advice on how to invest the money he would receive from the sweepstakes winnings. "I wanted him to put me with somebody, because I knew we had a tremendous amount of money, and we didn't know what to do with it." Katz referred them to Crystal.

A meeting was held on July 7, 1975 which was attended by the Harrells, Katz, Crystal, and another associate at Crystal's law firm. One of the topics discussed in the meeting was whether to take the entire winnings, approximated at $476,000, in one lump sum or spread it over a number of years. It was later decided to take the money in lump sum. The Harrells' foremost objective was financial security for them and their children. "I went to Mr. Crystal and I told him I wanted to be financially secure, and I wanted my kids to be financially secure, because I don't know nothing. I'm putting it in your hands." Mrs. Harrell explained that she "put a lot of time in" with her six children and she "wanted to find something that we could do where it would pay off for the children down the line."

Crystal wrote a letter to the Harrells dated August 19, 1975, in which he advised in pertinent part as follows:

"We will further attempt to find various ways to minimize your federal income taxes for 1975; but keep in mind there is only so much we can do without making some investment in a tax shelter. We have mixed thoughts about tax shelters because most of them have very little economic substance; and unless we find something that is extremely well put together and does have good economic substance, we will not recommend any tax shelter to you."

In subsequent months, Crystal wrote several letters to the Harrells about investment prospects and tax shelters. He sent a letter to Katz informing him of the efforts his firm was making in finding tax shelters for the Harrells.

---

1. Prior to winning the sweepstakes, Mr. Harrell was working on the General Motors assembly line and his wife was employed by the East Cleveland schools with a combined annual income of $20,000.

"At this time we are looking for some type of no risk tax shelter for the Harrells and in the event we can find one, we would probably suggest some of those proceeds be so invested." In a letter dated November 5, 1975, Crystal wrote to the Harrells, stating in pertinent part:

"I have briefly reviewed the possibility of such investments with Edd when I spoke to him recently. Subsequent to that time, I have made several contacts with people that we know to see what investments are available at this time. We have discussed, for example, an investment in cattle breeding, acquiring interest in oil wells and oil well leases, and the possibility of investing in movie distribution syndications. *I have scheduled a meeting with a Mr. John Gabura who is an expert in all types of tax shelter investments. I will be meeting with him on Monday, November 10, 1975.*" (Emphasis added.)

After several communications to the Harrells, in late November 1975, the Harrells met with Crystal at his office. Crystal presented them with packages of investment documents for their signature. Crystal testified that he went over each of the investments before Mr. Harrell signed them. Mr. Grdina, the salesman for one of the shelters, was present at the signing. Mrs. Harrell admitted that Mr. Harrell went over the documents with Crystal. She stated further that Crystal "explained to us that this is what he investigated and found that would be the best route for us to take." Mrs. Harrell continued:

"It was kind of overwhelming to me. And I said about the investments, 'Are we going to be able to keep up with this ourself?' When I left Mr. Crystal's office after we signed those papers, I felt that I was financially secure; and Edd and I both felt that we had done the right thing and found professional people to help us."

The Harrells invested nearly $100,000 of their sweepstakes winnings at the November meeting with Crystal on "tax shelter investments." The investments were on cattle breeding, movie distribution rights to motion pictures named "Bod Squad" and "Convoy Buddies," and London Commodity Silver Straddles. According to Mrs. Harrell, Crystal assured her that he would watch their investments and take care of their taxes for the next several years.

The Tax Shelters

A. The Grdina Cattle Investment

Crystal investigated and met with Grdina, who was the cattle promoter. Crystal had never before executed a cattle deal. The program was designed so that the Harrells would defer cash payments until several years into the

program. The Harrells invested $50,000 in the cattle program and were supposed to have purchased sixty-six heads of breeding cows to be depreciated over seven years and then sold off for the original purchase price.

The Internal Revenue Service ("IRS") disallowed the depreciations, ruling that the investment was a sham because (1) the investment documents never passed title of any identifiable cow to the Harrells and tax benefits could not pass to the Harrells without ownership rights; (2) the cattle were overpriced and were primarily purchased with nonrecourse notes, which failed to satisfy the standard "risk of ownership" criteria. The IRS concluded that the Harrells did not enter the cattle program venture for profit and could not take investment credit on the cattle investment and all deductions for expenses and losses incurred were disallowed.

It was later discovered that Grdina sold exactly the same heads of cattle to several investors.

B. The Movie Investment

Crystal procured the movie deals through John Gabura. The Harrells invested $26,000 at the November 1975 meeting with Crystal. The movie deal called for the Harrells to invest in two limited partnerships to be formed ("Paces" and "Cumberland"). The partnerships after their formation were to acquire distribution rights to show "Bod Squad" and "Convoy Buddies" before the year's end (1975).

The promoter of Paces and Cumberland Partnerships, a Mr. Branch, had no previous experience in the movie distribution business. This fact was known to Mrs. Crystal and Gabura but was not told to the Harrells. Crystal testified that he informed the Harrells that Congress was considering changes on the favorable aspects of movie investments. Crystal decided that the benefits were worth the risks. Branch first attempted to show the movies during the last week of 1975 and neglected to ensure that they were shown or placed in service before the year's end. This failure led the IRS to deny the depreciation for 1975. The IRS concluded, as it did in the cattle investment, that the movies were grossly overvalued and that the nonrecourse financing employed lacked economic substance. The Harrells lost their $26,000 investment in the movies.

C. The London Silver Straddles Investment

The London Commodity Silver Straddles investment was obtained also by Crystal from Gabura. It was intended to generate large ordinary losses in the first year and capital gains in the next. The Harrells paid $13,000 for the Silver Straddles at the November 1975 meeting. Their tax returns for 1975 showed an ordinary loss of $100,000. The IRS, as in the other investments,

*supra,* determined that the documents failed to show that Silver Straddles were actually purchased, or that the Harrells actually owned any rights to the silver, or were actually at risk in the transaction. The IRS declared the transaction a sham, and again, the Harrells not only lost the $70,000 deduction, they also lost their $13,000 investment.

Crystal was not a licensed securities broker or an investment advisor. Crystal admitted that lawyers are not empowered to make investment decisions for their clients.

Ted Garver testified for the Harrells as an expert witness. He testified that the cattle, silver straddles and the movie investments posed "an extraordinarily high risk from a tax standpoint" and that "it would have been evident to Mr. Crystal or any other tax lawyer at the time that there was a large element of risk here." Crystal maintained that the investments he procured for the Harrells were "risky" but were not considered "high risks." Garver concluded that Crystal's conduct was "negligence, even recklessness."

Gabura testified that he and Crystal advised the Harrells of investment risks. However, Crystal testified that he did not recall specifically if he informed the Harrells about the risks involved. It was later revealed that Gabura was a convicted felon who stole from investors and whose securities broker's license was revoked for selling unregistered securities.

Attorney Byron Krantz, testifying for the defense, stated that Crystal had no way of knowing that the movies were overpriced by looking at the documents. He also stated that there was no reason for Crystal to believe that the Harrells were not getting title to the heads of cattle they paid for.

In 1978, the Harrells received notice from the IRS that their federal income tax returns for 1975 and 1976 were being audited. The Harrells called Crystal who asked them to send him the notice and he would take care of it. While he represented them in the IRS audit, he did not inform them how much money they stood to lose if the IRS prevailed. He did not inform them that interest was running on the money or that they could pay the IRS while the action is pending to stop the interest from running even though he testified that he specializes in tax law. The Harrells were assessed taxes and interest in the approximate amount of $340,000 by the IRS.

### III

Appellants' assignments of error are as follows:

"I. The trial court erred in overruling defendants' motion for a directed verdict on the claim of plaintiffs that they were entitled to recover, from

defendant, taxes for which plaintiffs were legally responsible, and interest on those taxes.

"II. The trial court erred in its calculation of damages by attempting to permit plaintiffs to recover the 'benefit of the bargain,' in a negligence claim.

"III. The trial court erred in overruling defendants' motion for a directed verdict, when plaintiffs failed to prove that any alleged negligence of defendants was the proximate cause of either additional tax liability or loss of investment.

"IV. The verdict is not sustained by the manifest weight of the evidence.

"V. The trial court erred in overruling defendants' motion for summary judgment and motion for a directed verdict based upon the statute of limitations.

"VI. The trial court erred in failing to give requested jury instructions."

Appellants' first and second assignments of error deal with the issue of damages and will be addressed together. Appellants argue in their first assignment of error that the trial court erred by denying their motion for directed verdict or, in the alternative, for a new trial because plaintiffs were legally responsible for the payment of the taxes owed to the IRS. In their second assignment of error, appellants argue that the trial court miscalculated the amount of damages appellees were entitled to recover. Appellants' argument has no merit.

 It is improper for a trial court to grant a judgment notwithstanding the verdict where there is sufficient evidence to enable the jury to conclude that the negligence of the moving party was the proximate cause of the non-moving party's damages. *Jenkins v. Krieger* (1981), 67 Ohio St.2d 314, 21 O.O.3d 198, 423 N.E.2d 856; Civ.R. 50(B). It is also settled law in Ohio that granting or denying a motion for a new trial rests within the sound discretion of the trial court and a reviewing court will not disturb the verdict absent an abuse of discretion. *Verbon v. Pennese* (1982), 7 Ohio App.3d 182, 7 OBR 229, 454 N.E.2d 976; Civ.R. 59. See *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 5 OBR 481, 450 N.E.2d 1140; see also, *McClarty v. Herzog* (July 12, 1990), Cuyahoga App. No. 57238, unreported, 1990 WL 96054.

 In the case *sub judice,* the jury had sufficient evidence before it to reasonably conclude that appellants breached a duty of care owed to the Harrells, proximately causing them an investment loss.

 There is also sufficient evidence to enable the jury to conclude that the Harrells would not have incurred the interest and or penalties assessed by the IRS "but for" appellants' conduct. Appellees' expert witness testified that

appellants did not exercise the standard of care required in their advice to appellees and that such negligent conduct was not only careless, but reckless. He further opined that had appellants exercised reasonable care, appellees would not have lost their investment capital in the cattle and silver straddles and that proper advice would have eliminated the interest assessed by the IRS. The trial court's denial of appellants' motion for directed verdict is proper.

Appellants further argue that the trial court did not properly calculate the amount of damages. They contend that the trial court's calculation included the amount of taxes appellants were legally obligated to pay to the IRS. Appellants interpret the trial court's calculation as giving appellees the "benefit of the bargain." We disagree. Appellants cite the Restatement of the Law 2d, Torts (1976), Sections 552 and 552B, which read in pertinent part as follows:

"§ 552. Information Negligently Supplied for the Guidance of Others

"(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information."

"§ 552B. Damages for Negligent Misrepresentation

"(1) The damages recoverable for a negligent misrepresentation are those necessary to compensate the plaintiff for the pecuniary loss to him of which the misrepresentation is a legal cause, including

"(a) the difference between the value of what he has received in the transaction and its purchase price or other value given for it; and

"(b) pecuniary loss suffered otherwise as a consequence of the plaintiff's reliance upon the misrepresentation.

"(2) the damages recoverable for a negligent misrepresentation do not include the benefit of the plaintiff's contract with the defendant."

Webster's New Collegiate Dictionary (7 Ed.1975) defines "pecuniary" as "consisting of or measured in money; of or relating to money." While appellees may not recover the amount of tax liability owed to the IRS from appellants, they can recover the interest assessed as a pecuniary loss which is a direct consequence of appellants' negligence.

Crystal testified that appellees would have paid $233,000 in federal taxes had it not been for his advice. Appellees are currently assessed a tax liability plus interest of $340,000. Appellees paid $75,000 in federal taxes in 1975 and

lost \$75,606 in the tax shelter investments. The trial court calculated the damages as follows:

| | |
|---|---:|
| The current tax liability which includes interest | \$340,000 |
| Less appellants' tax liability | 233,000 |
| Add tax already paid | 75,000 |
| Total | 182,000 |
| Add the shelter investment loss | 75,606 |
| Total damages | \$257,606 |

The trial court's calculation did not include appellants' tax liability but represents interest and investment loss which were direct results of appellants' breach of standard of care. Appellants' first and second assignments of error are overruled.

## IV

Appellants, in their third assignment of error, argue that appellees did not prove that their negligence was the proximate cause of appellees' additional tax liability or loss of investment. We disagree. The court is *Minick v. Callahan* (App.1980), 24 O.O.3d 104, at syllabus by the editor, held that:

"In order to establish a claim of legal malpractice based on an alleged failure to exercise the knowledge, skill and ability ordinarily possessed and exercised by members of the legal profession similarly situated, expert testimony is necessary to establish such standards. If plaintiff fails to introduce such testimony, the defendant attorney is entitled to a directed verdict." See, also, *Bloom v. Dieckmann* (1983), 11 Ohio App.3d 202, 11 OBR 298, 464 N.E.2d 187; *Howard v. Sweeney* (1985), 27 Ohio App.3d 41, 27 OBR 43, 499 N.E.2d 383; *Gibbons v. Price* (1986), 33 Ohio App.3d 4, 514 N.E.2d 127.

In the case *sub judice*, the record is uncontroverted that an attorney-client relationship existed between appellants and appellees. Appellees put forth evidence by way of an expert witness who testified that appellants' conduct violated the standard of care owed to appellees. The record of appellants' conduct as analyzed by appellees' expert witness lead the jury to conclude that but for appellants' violation of the standard of care owed to appellees (failure to properly investigate the investments and the individuals involved; failure to request a letter ruling from the IRS to determine whether the shelters were legal; purchasing cattle without determining extent of client's ownership interests; recommending movie investment ignoring warning that it was being eliminated), appellees would not have incurred the investment loss and also the IRS interest would not have been levied had proper advice been given appellees on their tax liability. The issue of proximate cause was properly

decided by the jury. Appellants' third assignment of error is not well taken and is overruled.

## V

Appellants, in their fourth assignment of error, argue that the jury verdict is against the manifest weight of the evidence. Appellants' argument has no merit.

"In reviewing the court's judgment, we are guided by the principle that judgments supported by competent, credible evidence going to all the material elements of the case must not be reversed, as being against the manifest weight of the evidence, *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578. Every reasonable presumption must be made in favor of the judgment and the findings of facts. *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 10 OBR 408, 461 N.E.2d 1273. Finally, if the evidence is susceptible of more than one construction, we must give it that interpretation which is, consistent with the verdict and judgment, most favorable to sustaining the trial court's verdict and judgment. *Seasons Coal Co., supra; Gates v. Bd. of Edn. of River Local School Dist.* (1967), 11 Ohio St.2d 83, 40 O.O.2d 91, 228 N.E.2d 298; *Ross v. Ross* (1980), 64 Ohio St.2d 203, 204, 18 O.O.3d 414, 415, 414 N.E.2d 426, 428." *Karches v. Cincinnati* (1988), 38 Ohio St.3d 12, 19, 526 N.E.2d 1350, 1357.

In the instant case, the jury heard the testimony of appellants and their witnesses and also heard the testimony of appellees and their witnesses. The jury was in a better position to judge the credibility of the witnesses, by observing their demeanor and their testimony, than this court. *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212. It is the function of the jury, where the evidence is conflicting, to weight the evidence, and, by so doing, to determine where the truth lies. *Painesville Utopia Theatre v. Lautermilch* (1928), 118 Ohio St. 167, 160 N.E. 683. Having found no miscarriage of justice from the jury verdict, we overrule appellants' fourth assignment of error.

## VI

Appellants, in their fifth assignment of error, argue that the trial court erred by denying their motion for a directed verdict where the statute of limitations, R.C. 2305.11(A), precluded appellees from litigating their complaint. Appellants argue that appellees should have brought their action within one year of the notice from the IRS. Appellants further argue that their representation of appellees after the IRS notice was a separate and distinct representation from their original 1975 tax and shelter advice. We

disagree. The Ohio Supreme Court held in *Omni–Food & Fashion, Inc. v. Smith* (1988), 38 Ohio St.3d 385, 528 N.E.2d 941, syllabus, that:

"1. Under R.C. 2305.11(A), a cause of action for legal malpractice accrues and the one-year statute of limitations commences to run either when the client discovers or, in the exercise of reasonable diligence should have discovered, the resulting damage or injury, or when the attorney-client relationship for that particular transaction or undertaking terminates, whichever occurs later. (*Skidmore & Hall v. Rottman* [1983], 5 Ohio St.3d 210, 5 OBR 453, 450 N.E.2d 684, explained and modified.)

"2. For the purposes of determining the accrual date of R.C. 2305.11(A) in a legal malpractice action, the trial court must explore the particular facts of the action and make the following determinations: when the injured party became aware, or would have become aware, of the extent and seriousness of his or her alleged legal problem; whether the injured party was aware, or should have been aware, that the damage or injury alleged was related to a specific legal transaction or undertaking previously rendered him or her; and whether such damage or injury would put a reasonable person on notice of the need for further inquiry as to the cause of such damage or injury."

The Ohio Supreme Court held in *Zimmie v. Calfee, Halter & Griswold* (1989), 43 Ohio St.3d 54, 57, 538 N.E.2d 398, 401, that attorney malpractice may be filed within one year from "when the attorney-client relationship for that particular transaction or undertaking terminates or when the client discovers the resulting damage or injury, *whichever occurs later.*"

Appellant Crystal, in his letter acknowledging the termination notice he received, wrote the following letter to the Harrells:

"March 6, 1987

"*PERSONAL AND CONFIDENTIAL*

"Edd and Tincie Harrell

"22977 Newport

"Southfield, Michigan 48075

"Dear Mr. and Mrs. Harrell:

"I am in receipt of your message of March 5 wherein you have indicated that you no longer want our office to represent you. We are confirming your request through this letter, and I will notify the Court and the Appellate Division of Internal Revenue Service that we no longer represent you.

"Very truly yours,

"Larry Crystal

"LC/lah"

Appellees filed their complaint on May 28, 1987. Even viewing the facts most favorably for appellants, the instant action was timely filed. The nucleus of appellees' action is the advice on the tax shelters and the returns filed for them by appellants, all of which are inseparable within the facts of this case. We thus have no difficulty, as did the trial court, in holding that appellees filed their action within the statutorily allowed time. In light of this holding, we find it unnecessary to address all of appellants' argument on this issue as we find them unpersuasive. Accordingly, appellants' fifth assignment of error is overruled.

## VII

Appellants argue in their sixth assignment of error that the trial court failed to give requested jury instructions. Appellants argue that the trial court failed to instruct the jury on the doctrine of assumption of risk. We must emphasize that Ohio is a comparative negligence jurisdiction; therefore, implied assumption of risk and contributory negligence are no longer a bar to recovery in a negligence action. In Ohio the jury is to be instructed to evaluate the negligence of both parties, if applicable, and assign fault accordingly. It is also settled law in Ohio that the trial court is not required to instruct the jury in the exact language of the requesting party. A substantial compliance with the requested instruction which is a correct statement of the law is all that is required. *Pallini v. Dnakowski* (1969), 17 Ohio St.2d 51, 46 O.O.2d 267, 245 N.E.2d 353; *Hardiman v. Zepp Mfg. Co.* (1984), 14 Ohio App.3d 222, 14 OBR 250, 470 N.E.2d 941. See, also, *Jenkins v. Clark* (1982), 7 Ohio App.3d 93, 7 OBR 124, 454 N.E.2d 541.

In the instant case, the trial court instructed the jury as follows:

"The Harrells, likewise, have a duty to act reasonably and prudently in conducting their own affairs. This includes the taking of certain risks. The Harrells have the right to rely upon Mr. Crystal's advice. The jury must determine whether any damages you find were the result of Mr. Crystal's claimed negligence or occasioned by risks understood and accepted by the Harrells."

The trial court's instruction is substantially in compliance with the law. The jury is told to evaluate both party's conduct and determine if within the facts and evidence as presented to them the Harrells were reasonable in their reliance on appellants' advice. If the jury found their reliance to be unreasonable, then they cannot recover any damages. If on the other hand, their reliance was reasonable, then appellants' conduct constituted a violation of standard of care which if proven to be the proximate cause of appellees'

damages makes appellants liable to appellees for their loss. It is true that a trial court, in proper situations where a party proves an implied assumption of risk or contributory negligence as an affirmative defense, should instruct the jury to apportion the damages according to the percentage of each party's fault if both are found to be negligent. However, in the case *sub judice*, appellants' failure to prove affirmatively that appellees were negligent precludes the trial court from rendering such instruction and makes the instruction "as is" proper. Appellants' sixth assignment of error is overruled.

## VIII

### Cross–Appeal

Appellees argue in their sole assignment of error on cross-appeal that the trial court erred by not awarding them "expectancy damages." Appellees argue that they should be awarded damages on their breach of contract claim. Appellees tend to forget that a breach of contract by a professional is in law called an action in malpractice.

A professional malpractice cause of action, though in negligence, is actually nothing but a breach of contract of representation. We therefore cannot subscribe to appellees' theory of giving a second action of contract of "expectancy." We held in appellants' first and second assignment of error, *supra*, that appellants are not required to pay for appellees' tax liability. Whether appellees paid it when it was due or later the responsibility to pay the taxes due remains that of the appellees. The responsibility cannot be shifted for the simple reason that they were given bad advice. The only thing recoverable are the damages that resulted from negligent advice, which in the instant case is the interest and/or penalties.

Appellees' argument that there was some type of a breach of warranty is unpersuasive and unsupported by the record and does not warrant further discussion by this court. Appellees' sole cross-assignment of error is overruled.

The trial court's judgment on appellants' direct appeal is affirmed and its judgment on appellees' cross-appeal is also affirmed.

*Judgment affirmed.*

JOHN F. CORRIGAN, P.J., and SPELLACY, J., concur.