GATES, APPELLANT, *v.* BOARD OF EDUCATION OF RIVER LOCAL
SCHOOL DISTRICT, APPELLEE.
NIPPERT, APPELLANT, *v.* BOARD OF EDUCATION OF RIVER LOCAL
SCHOOL DISTRICT, APPELLEE.

(Nos. 40598 and 40599—Decided July 5, 1967.)

Messrs. *Lucas, Prendergast, Albright & Warren* and *Mr. Rankin M. Gibson,* for appellants.

Mr. *George F. Burkhart,* prosecuting attorney, for appellee.

SCHNEIDER, J.   Jurisdiction of these cases was assumed because the facts indicated a substantial question involving *public* interest, as that term was construed by the delegates to the Constitutional Convention of 1912, that is, an interpretation of Section 3319.081, Revised Code,[1] relating to the employment of nonteaching personnel by a local board of education, of which there are hundreds in the state.

Thomas A. Gates and Walter J. Nippert, plaintiffs to declaratory judgments in the Common Pleas Court of Monroe

---

[1]Section 3319.081, Revised Code. "In all school districts wherein the provisions of Sections 143.01 to 143.48, inclusive, of the Revised Code do not apply the following employment contract system shall control for employees whose contracts of employment are not otherwise provided by law:

"(A) Employees, with at least one year of service in the school district, provided their employment is continued, shall be employed for a period of not less than one year nor more than five years.

"(B) After the termination of the contract provided in Division (A), and thereafter provided their employment is continued, the contract shall be for not less than two years nor more than five years.

"(C) The contracts as provided for in this section may be terminated by a majority vote of the board of education. Such contracts may be terminated only for violation of regulations as set forth by the board of education. Any nonteaching school employee may terminate his contract of employment thirty days subsequent to the filing of a written notice of such termination with the clerk of the board."

County, from the affirmance of which these appeals are pursued, were nonteaching employees ("maintenance helpers") of the Board of Education of the River Local School District from July 1, 1959, to March 12, 1965. The explicit terms and conditions of their employment, which were never reduced to formal written agreements, are obscured by ambiguities appearing in the payroll records and in the minutes of the board. Indeed, no minutes pertinent to the first two school years[2] appear in the record. Nor does the petition set forth the plaintiffs' claims in detail.

However, the appellants' position, as expressed in brief and argument, is that their employment for each of the first two school years (ending June 30, 1960, and June 30, 1961) was on a yearly basis. On the other hand, it is not contested that Section 3319.081, Revised Code, does not prevent the board of education of a local school district from employing nonteaching personnel for an indeterminate period to be measured by the work required to be accomplished as determined by the board.

Nor is it disputed by appellee that appellants rendered more than 120 days of service in each of the years in question.[3] Thus, if the appellants were employed for a yearly term in the school year ending in June 1960 (the base year) and again for the following school year, the requirement of paragraph (A) of Section 3319.081, Revised Code, would be fulfilled, and paragraph (B) would mandate a two-year contract for each of the

---

[2]Section 3313.62, Revised Code. "The school year shall begin on the first day of July of each calendar year and close on the thirtieth day of June of the succeeding calendar year. A school week shall consist of five days, and a school month of four school weeks."

[3]Section 3319.09, Revised Code. "As used in Sections 3319.08 to 3319.18, inclusive, of the Revised Code:

"(A) Teacher means all persons certified to teach and who are employed in the public schools of this state as instructors, principals, supervisors, superintendents, or in any other educational position for which the employing board requires certification.

"(B) 'Year' as applied to term of service means actual service of not less than one hundred twenty days within a school year; provided that any board of education may grant a leave of absence for professional advancement with full credit for service.

"(C) 'Continuing service status' for a teacher means employment under a continuing contract."

school bienniums ending in 1963 and in 1965, in which case appellants would be entitled at least to their full salaries in some of those years in which they did not receive them. If, however, their employment was for an indeterminate period, they have been paid according to the terms of their contracts, that is, they make no claim that they have not been paid for any services actually performed or for less than 120 days in any of the years involved.

The question in these appeals is, therefore, principally one of discerning the terms and conditions of their employment, which, in the absence of contracts clearly expressive of those features, must be determined from the statements and conduct of the parties and the circumstances surrounding the same and is within the province of the trier of the facts.

The Common Pleas Court found that "plaintiffs were hired and kept on the payroll to furnish labor on special tasks as they arose from time to time in the construction and improvement program of the defendant. On the other hand, the other [regular] two maintenance men were charged with the routine maintenance work. * * * [; that] occasionally, because of the necessities of the work and the availability of the men, plaintiffs and the other two maintenance men worked together, either on improvement program work or routine maintenance * * * [; and that] [p]laintiffs were *extra* men hired to perform the *extra* general labor required."

If the evidence supports those findings, they will not be disturbed by this court, even though they may appear to be against the weight of the evidence.[4] Already noticed is the

---

[4]The term, "weight of the evidence," so frequently misunderstood by both bench and bar, is succinctly illustrated by these cases. There is virtually no conflict or contradiction in the evidence in these cases. But if more than one conclusion of fact may be drawn therefrom and the trier of the facts arrives at one conclusion as opposed to another, neither the trial court, in the case of a jury, nor a reviewing court may substitute its judgment that another conclusion should control, but may order a new trial. On the other hand, the Supreme Court is not required to, and ordinarily will not, decide that the contrary conclusion is preferable and, therefore, order a new trial. Thus, no court of review is permitted upon appeal on questions of law to weigh evidence and to substitute its judgment as to conclusions of fact for that of the trier of the facts.

fact that appellants worked more than a full school year in each year in question. Indeed, they averaged nearly 250 days per year, were out of "employment" but three weeks in the year 1961, one week in 1962 and six weeks in each of the years 1963 and 1964, and, except for these weeks, never worked less than 20 days in any month. In 1965, they had worked virtually full time until March 12th, the effective date of their last termination of employment. Near the end of each of the four school years prior thereto, the board systematically "terminated" their services effective, respectively, June 30, 1961, May 31, 1962, April 30, 1963, and April 24, 1964, and each time shortly thereafter rehired them for the following year.

On the payroll sheets for 1959 and a portion of 1960, appears the notation that appellants were "employed by day" at "rate per day" of $13.75. The new sheets commencing in September 1960, however, bear the simple legend, "employed," at a monthly rate. On each of the appellants' separate records commencing in September 1962, the legend, "employed per day—$16 per day," is stricken over.

During the entire period in question sick leave was granted and meticulously accounted for on the payroll records and vacation pay was awarded for the first two school years in question.

The foregoing supports the contention that appellants were employed on yearly contracts and that appellee deliberately attempted to protect itself from the further commitments mandated by the statute by the device of annual discharges.

However, it appears that appellants' understanding of the terms of their employment was otherwise. On cross-examination, Gates testified as follows:

"Q. In your employment, was there anything—did you understand that there was anything that would guarantee you so many days of employment throughout the year? A. Well, no. I couldn't say that there was anything to insure us of any steady employment or specified at any time we would be hired for two days or two years.

"Q. Your understanding was you were employed if there was work to do and if there wasn't work— A. I would take from Paul Zink—I had the opinion as long as there was work we would have the work to do.

"Q. But you didn't understand that you would work three hundred and sixty-five days a year? A. No."

The following appears from the redirect examination of Gates:

"Q. Were you ever employed by the defendant at an annual salary or daily salary or monthly salary, or what basis— A. Monthly salary. The same as the rest of the school was paid, we was paid [*sic*].

"Q. Were you paid monthly *or hired on an annual basis?* [Emphasis supplied.] A. Monthly. Paid monthly.

"Q. You don't ever recall any time that the school board paid you on an annual basis? A. No, sir; there wasn't any."

To the same effect was Nippert's testimony on direct examination:

"Q. And were you employed on a salary or a daily wage or hourly wage or how were you employed? A. Well, I was employed—I'll have to explain that in my own words. Mr. Gibson: All right. A. when I was asked to work he said two hundred and seventy-five a month and this adds up to thirteen seventy-five a day, and when we worked more than twenty days we got an additional thirteen seventy-five for each day we worked over the twenty days.

"Q. I see. So you apparently were hired on a monthly basis, is that what you are saying? A. That was my understanding."

On cross-examination Nippert testified as follows:

"Q. What was your understanding regarding your employment by the defendant? A. Well, as I know, it was never entirely discussed although as much work as there was at the time we were mostly told that there should be plenty of work for us right on through because I, at the time, was milking a little and I dropped it on account of thinking that it would go right on.

"Q. And did you understand at the time that there would be periods when you wouldn't have anything to do? Be laid off temporarily? A. Well, I wasn't told that.

"Q. Well, was it your understanding that you were to work every day? A. Well, that's the way I understood it that we was to work.

"Q. Now, as I understood your testimony a few minutes

ago, you understood if you worked twenty days you would receive a monthly salary? A. That's right.

"Q. And if you worked a day over that it would be thirteen and something? A. That's right.

"Q. Then it wasn't your understanding you were to work every day, was it, Mr. Nippert? * * * A. Well, after we worked for a year or two, and at that time we was working and I could see where there was plenty of work to be done, and I figured as long as our work was satisfactory we would get to work on.

"Q. You figured? A. Absolutely.

"Q. Was that your understanding? A. That was my understanding."

The "employment" action of the board for each of the school years commencing with 1962 and ending with 1965 clearly indicates the temporary nature of the employment and that, at least, each term was indeterminate, to be measured by the work available and required. On July 20, 1961, the superintendent was "authorized to employ the necessary labor and purchase necessary materials to place all school buildings in the district in readiness for the next school year." Although not specifically named, Gates and Nippert were employed for this purpose and started work July 24, 1961. On June 4, 1962, one month after the employment of Gates and Nippert had been terminated (effective June 1, 1962), the board re-employed them, effective June 5th, "to perform work at the Clarington gym as directed by the board through the supervisor of maintenance, at a salary of $300 per month each." On June 18, 1963, almost two months after plaintiffs were discharged (apparently without protest), they were employed "temporarily, to do renovation work at the Clarington School, starting June 24, 1963, at a salary of $350 per month each," and they commenced work according to the terms thereof.

The following year, on June 9, 1964, again almost two months after they had been discharged, they were re-employed "to remove within a period of not more than a total of forty (40) working days and to pay John Bender the sum of $330 to remove debris from same [referring to the removal of a school building]. Nippert explains the question of the removal of the school building in his cross-examination:

"A. We discussed we could do it for less money than what their contract bid called for.

"Q. What was the result? A. Give us the job.

"Q. On what basis? A. So much a day.

"Q. Not a month, but so much a day? A. So much a day.

"Q. Were you given a specific number of days in which you were to be done? A. We were.

"Q. And what was that? A. That was two months, or forty days."

Further on, Nippert was asked to explain the minutes of the board of April 28, 1964, reciting that Mr. Tom Gates and Mr. Walter Nippert were present and stated that the work they had been assigned was completed. They expressed appreciation— their appreciation—for the consideration the board had given them and requested they be considered in any future needs.

Nippert did not recall the date of the meeting but as he testified, "I know one meeting when we was laid off I did thank the board for what work I had done." Finally he was asked:

"Q. At any time were you advised that you were being employed at so much per year? A. No, never no yearly salary. Q. Just so much a month, is that right? Witness nodded affirmatively."

Appellants maintain that despite the decision of the board of education, further work was necessary to be done in and about the properties of the board, especially after March 12, 1965, and that public funds were available to pay for that work. In our judgment, these decisions are the prerogative of the board, a public body, accountable to the taxpaying public for the proper expenditure of public funds entrusted to it. That the board acted in good faith in this respect is confirmed by the undisputed fact that no other employees were engaged to do any of the work claimed to be waiting for attention. It is our further judgment that the findings of the Common Pleas Court are supportable by the record and that neither Section 3319.081, Revised Code, nor any other provision of law requires a board of education of a local school district to continue the payment of compensation to a nonteaching employee whose contract is for an indeterminate period after the board determines that no fur-

ther work is required of such employee and no additional or substitute employees are engaged by the board to perform the same work which would have been done by such employee, notwithstanding that such employee has been engaged in an actual service for the board for more than 120 days of the school year in which the employment is discontinued and for each of five consecutive years immediately prior thereto.

In view of the foregoing, in affirming the judgments below, it is unnecessary to, and we do not, decide whether in these cases it would have been incumbent upon the board to give appellants first preference in employing additional maintenance helpers through June 30, 1965, or to guarantee them not less than 120 days in any one school year.

*Judgments affirmed.*

TAFT, C. J., ZIMMERMAN, TROOP, O'NEILL, HERBERT and BROWN, JJ., concur.

TROOP, J., of the Tenth Appellate District, sitting for MATTHIAS, J.