**MARTIN, Appellee,**

**v.**

**CITY OF CLEVELAND, Appellant.**

[Cite as *Martin v. Cleveland* (1991), 66 Ohio App.3d 634.]

Court of Appeals of Ohio,
Cuyahoga County.

No. 58814.

Decided June 27, 1991.

*Sindell, Lowe & Guidubaldi Co., L.P.A.,* and *Steven A. Sindell,* for appellee.

*Craig S. Miller,* Director of Law, and *Janet E. Burney,* Assistant Director of Law, for appellant.

JAMES D. SWEENEY, Judge.

On August 3, 1987, Jeffrey L. Martin was injured while in the performance of his duties as an East Cleveland police officer. Between 5:30 and 6:30 p.m., while a passenger in the East Cleveland police cruiser driven by Sergeant Robert Godfrey, the officers observed a late model General Motors car drive through a stop sign. When the officers turned on the cruiser's overhead lights and siren, the suspect fled. Sergeant Godfrey, as the senior officer, decided to give chase. The chase was joined by another East Cleveland police cruiser manned by officers Paul Elston and Arthur Hardee.

As the chase proceeded down St. Clair Avenue into the city of Cleveland, it was seen by Cleveland police officers Joseph Mitchell and Michael Zedella. They informed the Cleveland police dispatcher that they were going to follow and assist in the chase.

The suspect, followed by the East Cleveland police, turned off St. Clair Avenue and onto East 146th Street. The Cleveland cruiser, driven by officer Mitchell, turned south on East 147th Street. At some point, the suspect exited his vehicle and fled on foot.

Officers Martin and Godfrey pursued the suspect on foot, as did officers Elston and Hardee. Sergeant Godfrey managed to grab the suspect's shirt, but slipped and fell, allowing the suspect to get out of his shirt and continue running.

Officer Martin continued the chase on the eastern side of East 148th Street, in a northerly direction. There was testimony that he was gaining ground, and might shortly have reached the suspect.

The Cleveland police officers had turned off East 147th Street and onto Elmhurst, and then turned onto East 148th Street, towards the chase. They were traveling south on East 148th Street.

Officer Martin testified that the Cleveland police were traveling at approximately forty miles per hour; that the road was dry; that he noticed no debris in the street; that he was four feet from the suspect at the time of impact; that the Cleveland police cruiser turned left, angling directly at or into the path of the suspect and himself; and that the Cleveland police cruiser came directly toward the suspect, crossed the northbound lane, jumped the curb and entered the sidewalk. Officer Martin stated that the Cleveland police cruiser came close enough to the suspect that the suspect was able to vault over the cruiser; that the cruiser continued moving, striking him with the left front of the cruiser, and throwing him into the air.

As a result of the accident, both bones in his lower left leg were broken. Officer Martin testified that it was his belief that the Cleveland police officers

were trying to strike the suspect and that no attempt was made to avoid striking him as well. Officer Martin did recall from the photographs of the area that there were skid marks in the street, indicating that the Cleveland police cruiser was attempting to stop.

East Cleveland police officers Elston, Hardee and Godfrey also testified, and corroborated the appellee's testimony in most respects pertinent to this appeal.

Specifically, officer Elston testified that officer Martin was closing in on the suspect; that he was ten to twelve feet behind officer Martin; that the Cleveland police cruiser was angled toward the sidewalk and was braking to a stop; that as the cruiser braked, the nose of the cruiser went down; that the cruiser was pointed so as to cut directly across the path of the suspect and officer Martin, it then left the street, hit the curb and went across the sidewalk. Officer Elston stated that the Cleveland police cruiser ran into officer Martin, who was airborne and then crumbled; that the speed of the cruiser when he first noticed it and heard the skid was thirty-five m.p.h.; and that the cruiser went in a straight line toward the sidewalk. Officer Elston did not stop when the accident occurred, but instead continued to chase the suspect.

Officer Elston testified that at the time of the accident he believed the Cleveland cruiser was trying to block the path of the fleeing suspect.

Sergeant Godfrey testified that the road was dry and to the best of his knowledge there was no debris present; that he had the suspect by the shirt but slipped, allowing the suspect to get out of the shirt and escape; that officers Hardee and Elston then passed him; and that he was able to observe the action in front of him. He stated that officer Martin was gaining ground on the suspect; that he heard brakes squealing, saw the Cleveland police cruiser on the sidewalk and officer Martin going up in the air. At the time he saw the Cleveland police cruiser, it was proceeding at about forty m.p.h. Sergeant Godfrey testified that the cruiser was still moving after it hit officer Martin; and that it stopped after it hit a small brick wall along the grass.

He stated that it appeared the Cleveland police cruiser was trying to block the path of the suspect; that this action was not consistent with police training as the Cleveland police cruiser was going too fast to stop on the sidewalk; and that the well-being of the suspect and of officer Martin had been endangered. The sergeant testified that it did not appear to him as though the Cleveland police cruiser was trying to park at the curb and went out of control; but rather that, in his opinion, the cruiser intentionally went up onto the sidewalk.

Officer Hardee testified that after Sergeant Godfrey fell, he was behind officer Martin and officer Elston in the foot pursuit of the suspect; that officer Martin was gaining on the suspect; that he saw the Cleveland police cruiser come in a diagonal direction toward both the suspect and officer Martin; that the cruiser hit its brakes and went up onto the sidewalk; that the speed of the cruiser was forty to forty-five m.p.h., and that the cruiser was slowing when he heard the brakes applied. The suspect was able to dodge the cruiser, and officer Martin was then hit. Officer Hardee was definite that the cruiser was moving as it hit officer Martin. He stated that officer Martin went into the air and landed on the lawn; and that the cruiser continued to move, but not far. Officer Hardee did not continue the pursuit, but instead stayed with officer Martin.

Officer Hardee testified that he had no reason to believe that the Cleveland police cruiser was trying to injure either officer Martin or the suspect, but that he had the impression that the cruiser was trying to block the suspect's way by cutting off his path on the sidewalk; and that he believed the Cleveland police officer was trying to stop prior to reaching the suspect so that he could jump out and help apprehend him.

In addition, officer Hardee stated that he did not believe debris on the road was a determining factor in the skid. The determining factors were the direction of the vehicle as determined by the driver, the speed of the vehicle and the application of the brakes.

For the defense, Cleveland police officers Joseph Chojnowski and Russel Theiss from the Accident Investigation Unit testified that they investigated this accident and filled out all of the appropriate forms and reports. They took photographs at the scene and spoke with the officers who were there, and then went to the hospital to speak with officer Martin and Sergeant Godfrey.

Officer Chojnowski testified that he observed the roadway surface was covered with debris; and that there was a storm the night before, and the sewers could not handle all of the debris. He stated there were leaves and branches on the street as well as silt and sand.

He also stated that the street at the time of the accident was dry. The skid marks were measured, and based on the type of road surface and the length of the marks, he estimated the speed of the car to be no more than twenty m.p.h. He also stated that in this type of skid, the tires are locked, and not rotating at all.

Officer Chojnowski observed no damage to the Cleveland police cruiser. Chojnowski testified that after the investigation it was determined that the Cleveland police cruiser ended up on the sidewalk after sliding on the debris.

There was no evidence to indicate officer Mitchell entered the sidewalk in an effort to block the suspect's path; and no evidence that officer Mitchell was traveling forty m.p.h.; in fact, the evidence showed he was well under that speed. Officer Chojnowski stated that had the cruiser been going forty m.p.h., there would be a broken front grill and headlights, a dent in the front bumper, and that the victim would roll up on the hood of the car and, most likely, strike the windshield. The Cleveland police cruiser had no such damage.

It was the opinion of officer Chojnowski that officer Mitchell did not operate the Cleveland police cruiser in a careless manner.

Officer Theiss corroborated this testimony; he observed the debris on the street; took photographs; spoke with the officers still present; and noted that there was no damage to the Cleveland cruiser. He stated the cruiser was traveling approximately twenty m.p.h.; and there was no evidence of an intent to strike anyone. In addition, he testified that there was evidence that officer Mitchell attempted to take an evasive maneuver by turning his wheels to the right. This was shown by the skid marks.

Both officers Theiss and Chojnowski testified that at the hospital, officer Martin stated that he had attempted to jump over the left front fender of the cruiser, put his hand down to brace himself and that his hand had slipped so that he did not make it over the top.

In the course of their investigation, neither officer Theiss nor officer Chojnowski spoke with officer Hardee or officer Elston.

A disciplinary hearing was held in front of the Director of Public Safety, Mitchell Brown. Officer Mitchell was given a letter of reprimand and required to attend a defensive driving course before he was permitted to drive a Cleveland police vehicle again. Officer Mitchell was not suspended and lost no pay. Director Brown testified that there was no evidence that officer Mitchell intended to strike the fleeing suspect or attempted to block the suspect's path; nor was there any evidence of excessive speed; there was no evidence that officer Mitchell knew that by operating his vehicle in the manner he did, that he was going to cause injury to either the suspect or officer Martin.

Appellant officer Joseph Mitchell's description of the accident is significantly different from that of officers Martin, Godfrey, Hardee and Elston. He testified that he and his partner, Michael Zedella, were westbound on St. Clair Avenue in Cleveland when they heard sirens. They saw an East Cleveland police cruiser pursuing a 1978 or 1979 Buick Regal or Oldsmobile Cutlass. After informing the dispatcher, he did a U-turn, put on his cruiser's lights and siren, and followed the chase.

When the East Cleveland cruiser turned down East 146th Street, he turned down East 147th Street, then onto Elmhurst, and then onto East 148th Street. Officer Mitchell testified that he was driving slowly on East 148th Street because he did not know where the suspect was; that he and his partner then spotted the suspect running, followed by officers Martin and Elston; officers Martin and Elston both had their guns drawn; and that the suspect was outrunning officer Martin.

In order to assist, officer Mitchell tried to pull his cruiser into the curb at an angle so that his partner could assist the other officers more quickly. Officer Mitchell stated that he was driving fifteen to twenty m.p.h.; that he applied the cruiser's brakes heavily so as to stop quickly; that the cruiser went into a skid and that he turned the steering wheel to the right trying to return the cruiser to the street. When the cruiser came out of the skid, and came to a complete stop, the suspect and officer Martin were still a good distance from the car. As officer Mitchell put the cruiser in park and started to exit the car, the suspect vaulted over the front end. The suspect did not put his hand on the car. Officer Mitchell testified that as he was opening his door, officer Martin ran into the cruiser. The suspect vaulted over the cruiser when the cruiser's nose was down, and by the time officer Martin ran into the cruiser, its nose was on the way up. Officer Martin put his hand on the cruiser in order to try to leap over it, was thrown into the air, and landed on his right leg.

Officer Mitchell, at appellee's direction, went in pursuit of the suspect. He assisted his partner in the suspect's capture. When they returned to the scene, Mitchell checked on officer Martin and radioed for an ambulance. Mitchell later assisted the paramedics in lifting the stretcher into the ambulance. Mitchell also made sure that officer Martin's gun was accounted for, as he had seen it in officer Martin's hand as Martin was falling down.

Officer Mitchell then went back to look at the street to see why the cruiser skidded, and discovered the debris in the street.

After his return to work, officer Mitchell was so upset that he was sent home. He first stopped at the hospital to see officer Martin. Martin told Mitchell that the accident was not Mitchell's fault, that he, Martin, should have jumped higher.

Officer Mitchell testified that he did not know there was debris in the street at the time of the skid; that at no time was it his objective to block the suspect's path, or to strike the suspect; that he believed once the cruiser was stopped, it would have been more dangerous to move it than to leave it where it was; that he did not know he would be unable to stop the cruiser at the curb; and that if he had known from the start that the suspect had committed

only a misdemeanor and not a felony, he would not have tried to assist in the chase.

The last witness for the defense was officer Michael Zedella. Zedella testified that officer Mitchell was trying to bring the front of the vehicle as close to the curb as possible; that even when the cruiser jumped the curb, he did not believe it would hit anyone; that at the end of the skid, the cruiser swerved to the right and did not go onto the lawn; that it was never his impression that officer Mitchell was trying to block the suspect's path; that it was not their intention to strike anyone. He also stated that if officer Mitchell had wanted to strike the suspect, he was in a position to do so.

Officer Zedella was primarily paying attention to the suspect and did not see officer Martin. The cruiser stopped, he watched the suspect jump over the cruiser, he opened his door and pursued the suspect. He was the first to spot the suspect and had his gun drawn when officer Mitchell arrived. East Cleveland officer Elston then handcuffed the suspect.

Back at the scene, officer Zedella moved the Cleveland cruiser because it was obvious it would be in the way of the ambulance.

On rebuttal, officer Martin testified that he and his partner both drew their guns when the suspect exited his vehicle as they did not know what he would do. After Martin started to run, he reholstered his weapon and continued the chase. Officer Martin stated that he did not have his weapon in his hand when he was struck.

Appellant's first and second assignments of error state:

"The trial court committed reversible error in denying defendants' motion for directed verdict."

"The trial court committed reversible error when it overruled defendant-appellants' motion for judgment notwithstanding the verdict or in the alternative motion for new trial."

■ In *Chemical Bank of New York v. Neman* (1990), 52 Ohio St.3d 204, 556 N.E.2d 490, the Supreme Court of Ohio cited with approval this court's decision in *Cardinal v. Family Foot Care Centers, Inc.* (1987), 40 Ohio App.3d 181, 532 N.E.2d 162. In *Cardinal,* we held:

"The same test is used for a motion for judgment notwithstanding the verdict and a motion for a directed verdict. *Nickell v. Gonzalez* [ (1985) ], *supra,* 17 Ohio St.3d [136] at 137, 17 OBR [281] at 282, 477 N.E.2d [1145] at 1147. The trial judge must construe the evidence most strongly in favor of the non-movant and if upon all the evidence there is substantial evidence to support the non-movant's position upon which reasonable minds may reach different conclusions, the motion must be denied. *Id.* The trial judge does

not determine the weight of the evidence or the credibility of the witnesses, *id.*, and although he examines the materiality of the evidence, he does not look at the conclusions to be drawn, *Ruta v. Breckenridge–Remy Co.* (1982), 69 Ohio St.2d 66, 69, 23 O.O.3d 115, 117, 430 N.E.2d 935, 938.

Construing the evidence most strongly in favor of the appellant, it is clear that the trial judge correctly denied both the motion for directed verdict and the motion for judgment notwithstanding the verdict.

In *Hawkins v. Ivy* (1977), 50 Ohio St.2d 114, 4 O.O.3d 243, 363 N.E.2d 367, the court set the test for wanton misconduct when it held:

"Where the driver of an automobile fails to exercise any care whatsoever toward those to whom he owes a duty of care, and his failure occurs under circumstances in which there is great probability that harm will result, such failure constitutes wanton misconduct."

In the case *sub judice,* the appellee presented evidence to raise a question as to whether or not officer Mitchell had failed to exercise sufficient care under the circumstances in which there was a great probability that harm would result.

This question was properly submitted to the jury. See *Osler v. Lorain* (1986), 28 Ohio St.3d 345, 350, 28 OBR 410, 414, 504 N.E.2d 19, 24, where the court held:

"Further, this court has previously observed that the question of whether an automobile driver's alleged unlawful conduct was wanton or willful is a question of fact for the jury to consider in light of all the surrounding facts and circumstances. See *Hawkins v. Ivy* (1977), 50 Ohio St.2d 114, 117 [4 O.O.3d 243, 245, 363 N.E.2d 367, 369]; *Tighe v. Diamond* (1948), 149 Ohio St. 520, 528–530 [37 O.O. 243, 247–248, 80 N.E.2d 122, 127–128]."

Turning next to the denial of the motion for a new trial, we find that the trial judge did not abuse his discretion.

Appellant argues that the jury's verdict was against the manifest weight of the evidence and therefore a new trial should be held.

In determining whether the jury's decision was supported by the manifest weight, this court is guided in its review by language contained in *Karches v. Cincinnati* (1988), 38 Ohio St.3d 12, 19, 526 N.E.2d 1350, 1357, where, the court stated:

"In reviewing the court's judgment, we are guided by the principle that judgments supported by competent, credible evidence going to all the material elements of the case must not be reversed, as being against the manifest weight of the evidence, *C.E. Morris Co. v. Foley Construction Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578. Every reasonable presumption

must be made in favor of the judgment and the findings of facts. *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 10 OBR 408, 461 N.E.2d 1273. Finally, if the evidence is susceptible of more than one construction, we must give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the trial court's verdict and judgment. *Seasons Coal Co., supra; Gates v. Bd. of Edn. of River Local School Dist.* (1967), 11 Ohio St.2d 83, 40 O.O.2d 91, 228 N.E.2d 298; *Ross v. Ross* (1980), 64 Ohio St.2d 203, 204, 18 O.O.3d 414, 415, 414 N.E.2d 426, 428."

Here, the jury had competent, credible evidence to support the verdict.

In addition, the *Osler* court stated that in ruling on a motion for a new trial, the trial court is afforded wide discretion in determining whether a jury's verdict is against the manifest weight. The court went on to state:

"Where the trial court's decision on the motion for a new trial involves questions of fact, as in this case, our task as a reviewing court is to 'view the evidence favorably to the trial court's action rather than to the jury's verdict.' "

We, therefore, affirm the trial court's ruling on denying the motion for new trial.

Appellant's first and second assignments of error are overruled.

Appellant's third assignment of error states:

"The trial court committed reversible error by admitting into evidence the disciplinary actions taken against officer Joseph Mitchell."

Appellant argues that evidence admitted as to the disciplinary actions taken against officer Mitchell was irrelevant, and that it was a subsequent remedial measure which is not admissible as evidence.

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401.

At trial, the city of Cleveland contended that the injuries sustained by officer Martin were the result of an unavoidable accident. Evidence as to the disciplinary action was relevant to show that in the city's internal proceedings, officer Mitchell's driving was not considered careful or lawful. Therefore, the testimony was relevant and admissible for the purposes of impeachment.

Although a disciplinary action can be a subsequent remedial measure, see *Sheller–Globe Corp., Leece–Neville Div. v. City Express Delivery Co.* (May 18, 1989), Cuyahoga App. No. 54351, unreported, 1989 WL 54365, as we have stated above, the evidence was admissible for purposes of impeachment.

We find appellant's third assignment of error without merit.

Appellant's fourth assignment of error states:

"The trial court erred to the prejudice of defendant-appellants by not giving precise jury instructions."

The trial judge charged the jury on wanton misconduct, and in addition he instructed the jury that the issue was not one of negligence, but rather of willful and wanton misconduct.

The record discloses that appellant's trial counsel objected when the judge initially stated he would not give a separate instruction regarding negligence. This discussion was properly held out of the jury's presence. However, at the time all of the charges were given to the jury, the judge stated:

"Ladies and gentlemen of the jury, it has been called to my attention, I'm asked to instruct the jury that the issue involved here is not negligence, but whether there was wanton or willful misconduct. Got that? Okay? Is that satisfactory?

"Appellant's trial counsel responded: Yes, your honor.

"The Court: No other additions, deletions, or corrections?"

None were set forth by appellant's counsel.

We find any error that may have been present was waived.

Proposed jury instructions seven and eight both are related to the surrounding circumstances at the time of the accident. The jury instructions given by the court on willful misconduct and on wanton misconduct adequately instructed the jury to consider all surrounding circumstances. See. *Bostic v. Connor* (1988), 37 Ohio St.3d 144, 524 N.E.2d 881. We therefore find no abuse of discretion.

The appellant's fourth assignment of error is not well taken.

Appellant's fifth assignment of error states:

"The trial court erred to the prejudice of defendant-appellants by not allowing defendants' interrogatories to be submitted to the jury."

Civ.R. 49 states that the court shall submit written interrogatories to the jury when requested by a party prior to commencement of argument. In *Cincinnati Riverfront Coliseum, Inc. v. McNulty Co.* (1986), 28 Ohio St.3d 333, 336, 28 OBR 400, 402, 504 N.E.2d 415, 418, the court held:

"Following a timely request by a party, a mandatory duty arises to submit written interrogatories to the jury, provided they are in the form the court approves. The wording of Civ.R. 49(B), that the "court shall submit written interrogatories * * * upon request of any party," *is mandatory in character*

*and leaves no discretion in the trial court on the question of submission, upon request, of proper interrogatories to the jury.* The rule, however, reposes discretion in the court to pass upon the *content* of requested interrogatories as they "shall be submitted to the jury in the form the court approves." ' (Emphasis added.) *Riley v. Cincinnati* (1976), 46 Ohio St.2d 287, 298 [75 O.O.2d 331, 338, 348 N.E.2d 135, 143], citing *Ragone v. Vitali & Beltrami, Jr., Inc.* (1975), 42 Ohio St.2d 161 [71 O.O.2d 164, 327 N.E.2d 645]."

■ In the case *sub judice,* the judge held that the second part of questions one and two would not be sent to the jury. The court stated: "It gives them too much, gives the jury too much problem, if they have to specifically say each point. They have to decide the whole theory."

We find that the trial judge was within his discretion to eliminate part two of both questions one and two.

We therefore find appellant's fifth assignment of error without merit.

Appellant's sixth assignment of error states:

"The trial court erred to the prejudice of defendant-appellants by not allowing defendants to cross-examine plaintiff Jeffrey Martin about his prior inconsistent statements regarding the nature of his injuries."

■ This assignment of error is without merit. Appellee withdrew his claimed back injury, and did not testify to any such injury. Any reference to a back injury would not have been relevant to the issues at trial and was properly excluded. Evid.R. 401.

Appellant's sixth assignment of error is overruled.

Appellant's seventh assignment of error states:

"The trial court erred by not deducting collateral sources from plaintiff-appellee's award."

■ R.C. 2744.05 delineates the legislature's position on the ability of a political subdivision to have any collateral benefits deducted from any judgment rendered against the political subdivision. The statute states in pertinent part:

"Notwithstanding any other provisions of the Revised Code or rules of a court to the contrary, in an action against a political subdivision to recover damages for injury, death, or loss to persons or property caused by an act or omission in connection with a governmental or proprietary function:

" * * *

"(B) If a claimant receives or is entitled to receive benefits for injuries or loss allegedly incurred from a policy or policies of insurance or any other

source, the benefits shall be disclosed to the court, and the amount of the benefits shall be deducted from any award against a political subdivision recovered by that claimant. No insurer or other person is entitled to bring an action under a subrogation provision in an insurance or other contract against a political subdivision with respect to such benefits. Nothing in this division shall be construed to limit the rights of a beneficiary under a life insurance policy or the rights of sureties under fidelity or surety bonds."

This section of R.C. 2744.05 was determined constitutional in *Menefee v. Queen City Metro* (1990), 49 Ohio St.3d 27, 550 N.E.2d 181. Although the issue was different, the Supreme Court did discuss the legislative purpose for enacting this statute:

"The statute serves two purposes. It conserves the fiscal resources of political subdivisions by limiting their tort liability. Secondly, it permits injured persons, who have no source of reimbursement for their damages, to recover for a tort committed by the political subdivisions.

"The state could have extended sovereign immunity to *all* claims against a political subdivision. Instead, it carved out limited classifications in response to reasonable concerns. * * *" (Emphasis *sic.*) *Id.* at 29, 550 N.E.2d at 182–183.

The court went on to state: "Most significantly, a state has a valid interest in preserving the financial soundness of its political subdivisions. See *Shapiro v. Thompson* (1969), 394 U.S. 618, 633 [89 S.Ct. 1322, 1330, 22 L.Ed.2d 600, 614]." *Id.* It is clear that, although one purpose of the statute is to allow compensation for injuries not otherwise compensated, another purpose is to protect the financial soundness of the city. In essence, the statute prohibits a litigant from recovering twice for the same injury.

█ In the case *sub judice,* there are clearly two competing interests. The appellee did not pray for and was not awarded damages for any injury for which he received compensation from another source. Nonetheless, the appellant maintains that R.C. 2744.05 is mandatory and any monies received by· appellee from a collateral source are deductible from the jury award.

We find it not only manifestly unfair, but inequitable, given the intent of the statute, to overturn the jury's verdict. Here, appellee had three types of losses: pain and suffering, lost overtime, and medical expenses. Appellee received compensation for medical expenses and, therefore, did not request compensation for these losses from the city. He has not tried to recover twice for the same loss.

Appellant's seventh assignment of error is overruled.

The judgment of the trial court is affirmed.

*Judgment affirmed.*

FRANCIS E. SWEENEY, P.J., and HARPER, J., concur.