JOURNAL ENTRY and OPINION
Plaintiff-appellant, The Estate of Anthony Marks, appeals from the trial court's alleged granting of a directed verdict in favor of defendant-appellee City of Cleveland and the jury verdict rendered in favor of defendant-appellee North American Manufacturing Company. (NAM). We find no merit to the appeal and affirm.
On October 21, 1996, between 9:30 a.m. and 10:00 a.m., Anthony Marks was killed while working at the City of Cleveland water treatment plant located on Nottingham Road. Marks was killed when one of the boilers at the plant exploded. He was found under one of the boiler doors which had blown off.
On October 14, 1998, the plaintiff filed a complaint against NAM, the City of Cleveland, Honeywell, Inc., Allen-Bradley Company, Inc. and Burnham Corporation.[1] Prior to trial the plaintiff voluntarily dismissed Honeywell, Inc., Allen-Bradley Company, Inc. and Burnham Corporation. Only plaintiff's claims against NAM and the City of Cleveland remained for trial. During the course of trial, however, the plaintiff also voluntarily dismissed with prejudice the City of Cleveland, leaving only its claims against NAM.
At trial the evidence indicated that the boiler was manufactured by NAM and installed at the Nottingham plant in 1975. There had never been an injury related to the boiler prior to the explosion in 1996.
Apparently, the weekend prior to the accident, plant workers had unsuccessfully tried to start the boiler for the first time since the boiler was shut down for the season the prior spring. Upon being restarted, the boiler would run for a short period and then shut down. The workers noted that the boiler's flame when ignited was a ragged yellow. On the following Monday, several attempts were again made to start the boiler to no avail.
Electrician Darrell Harris was called to determine the problem with the boiler. Harris testified that when he inspected the boiler he saw that part of the linkage was not connected because the set screw was missing. The linkage controls the different stages involved in lighting the boiler: the pre-purge phase which clears gas accumulated from prior lightings from the system, the ignition of the pilot, and the main fire position.
Harris put the linkage back on as best as he could with the screw missing and tried to start the boiler. The boiler started and Harris went to retrieve a set screw to further secure the linkage. According to Harris, Marks called Harris about 20 minutes later while Harris was looking for a set screw and told him the boiler shut down again.
When Harris returned with the set screw, the linkage was still in place. Harris unsuccessfully tried to restart the boiler and claims that he then shut the boiler down by turning off the power and told Marks that he would call for assistance. Harris then left and was in the next building when he heard the explosion.
Patrick Kearney, a state boiler inspector from the Division of Industrial Compliance, testified that he inspected the boiler after the accident. By looking at the control panel he could tell that the boiler stopped at the fire position. This indicated to him that someone turned the power to the boiler back on. He also noticed that the linkage was not attached but did not know if it had fallen off before or after the explosion. According to Kearney, the hinges on the boiler door were standard for this type of boiler.
David Dalton, a former employee of NAM testified that a day after the accident, on behalf of the City of Cleveland, he came to the scene to determine the cause of the explosion. Looking at the control panel, he determined that the boiler had gone through its pre-purge stage and blew up at the pilot lighting stage. He stated that during the purge stage, the shutters which allow air from the blower to enter the system to purge the gas, should open. He acknowledged, however, that the boiler did not have a device on the system by which the control panel could determine whether the shutters have actually opened. He did state, however, that even if the linkage had fallen off, the force of the air generated by the blower would have swung the shutters open. He stressed that the linkage arm falling off alone could not have caused the explosion.
Dalton testified that the control panel, the air pressure switch, and hinges on the doors were all within industry standards. (TR. at 332). Dalton also stated that the explosion could not have occurred unless the power was turned on and the boiler starter button pushed.
David Pettit, a retired NAM worker, testified that in 1996 he was a field service manager for NAM, which consisted of troubleshooting problems with boilers. To the best of his knowledge, this was the first Atlas Steamer boiler to have exploded. He was not permitted access to the accident scene until May of 1997 but stated that the accident scene appeared to have been untouched when he viewed it. He observed that the flue to the boiler had been wired shut and noted that the shutters were bent back indicating that they received the force of the explosion. He stated that the bent shutters did not necessarily mean they were shut at the time of the explosion, but merely indicated that they were more shut than open. He admitted that the control panel had no way of detecting whether the shutters were truly open or not and that the control panel also has no way of detecting whether the flue was open.
Both the plaintiff and defendant presented experts. Both experts agreed that the boiler exploded because accumulated gas from the prior starting attempts was not purged from the system prior to ignition. Both experts also agreed that the power had to have been turned on for the explosion to have occurred. The experts disagreed, however, on why the gas was not purged from the system.
Plaintiff's expert, Simon Tamny, a consulting engineer, testified that the accumulated gas was not purged because the linkage was not attached to the controls. According to Tamny, because the linkage was not attached, the shutters that allow the air in to purge the system were never opened. Tamny concluded that the boiler's design was defective because it provided no means to determine if air was sweeping out the gas. According to Tamny, at the time the boiler was manufactured, there were devices available that could detect whether air was flowing in the system. On cross-examination, however, Tamny admitted that the pressure switch on the boiler complied with the then-existing American Society of Mechanical Engineering standard, which did not require an instrument attached to measure air flow. (TR. at 580).
Tamny also found the boiler design defective because the boiler was not designed to unzip safely in case an explosion did occur. That is, he believed the doors should have been hinged with stronger hinges to prevent them from blowing off in the event of an explosion.
NAM's expert, Harri Kytomaa, an engineering consultant, testified that the linkage had to have been on at the time of the explosion due to the position and condition of some of the rods. Because of the damage in the area of the damper and flue, Kytomaa concluded that the flue had been completely or partially shut, which prevented the accumulated gas from being able to exit the system. He noted that the flue had been jerry-rigged with wiring to manually close or partially close it.
Kytomaa also stated that the design of the doors was a standard design used on most boilers. (TR. at 741). According to Kytomaa, the air pressure switch on the boiler was approved by the National Fire Safety Protection 85 standards and was therefore in compliance with industry standards for boilers.
Kytomaa also concluded that the boiler did detect the closed flue and damper as it presented a yellow raggedy flame instead of a blue flame when the pilot was ignited, indicating the lack of pure air, and also on at least four occasions it completely shut down, which according to Kytomaa, was a proper response by the boiler when the gas is not purged. He also stressed that safety procedures not only include the hardware of the boiler, but also the training of the staff operating the boiler.
Based on the above evidence, the jury found that the boiler was not defectively designed. The plaintiff now appeals, assigning four assignments of error.
 I. THE TRIAL COURT ERRED WHEN IT DIRECTED VERDICT IN FAVOR OF THE CITY ON R.C. 2744 ET SEQ.
 II. THE TRIAL COURT ERRED IN GRANTING A DIRECTED VERDICT IN-FAVOR OF THE CITY BECAUSE GENUINE ISSUES OF MATERIAL FACT PERSIST AS TO EACH OF THE THREE PRONGS OF THE FYFFE TEST.
 III. THE TRIAL COURT ABUSED ITS DISCRETION AND PREJUDICED THE PLAINTIFF IN GRANTING A DIRECTED VERDICT IN FAVOR OF THE CITY, AND NOT ALLOWING ANY ISSUES REGARDING THE CITY'S CONDUCT TO BE REVIEWED BY THE JURY.
We will address these assignments of error together as they all relate to plaintiff's contention that the trial court erred in granting a directed verdict in favor of the City.
A review of the record indicates that during trial, the plaintiff voluntarily dismissed its claims against the City with prejudice. A dismissal with prejudice operates as an adjudication on the merits and constitutes a final appealable order. Tower City Properties v. Cuyahoga Cty. Bd. of Revision (1990), 49 Ohio St.3d 67, 69. The plaintiff's choice of trial tactics in dismissing the City with prejudice prevents us from reviewing the propriety of the trial court's proposed delay in entering the directed verdict until after the jury verdict was returned.
Plaintiff's first, second and third assignments of error are dismissed.
 IV. THE VERDICT IN FAVOR OF NORTH AMERICAN MANUFACTURING WAS RETURNED AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
Plaintiff contends that the jury's finding in favor of NAM on plaintiff's defective design claim was against the manifest weight of the evidence.
Our review of a jury verdict as being against the manifest weight of the evidence is extremely limited. The standard for reviewing such a claim is set forth in Karches v. Cincinnati (1988), 38 Ohio St.3d 12,526 N.E.2d 1350. Therein, the Ohio Supreme Court stated:
 In reviewing the court's judgment, we are guided by the principle that judgments supported by competent, credible evidence going to all the material elements of the case must not be reversed, as being against the manifest weight of the evidence. C.E. Morris Co. v. Foley Construction Co. (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578.
 Every reasonable presumption must be made in favor of the judgment and the findings of facts. Seasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77, 10 OBR 408, 461 N.E.2d 1273.
 Finally, if the evidence is susceptible of more than one construction, we must give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the trial court's verdict and judgment. Seasons Coal Co., supra; Gates v. Bd. of Edn. of River Local School Dist. (1967), 11 Ohio St.2d 83, 40 O.O.2d 91, 228 N.E.2d 298; Ross v. Ross (1980), 64 Ohio St.2d 203, 204, 18 O.O.3d 414, 415, 414 N.E.2d 426, 428. Karches, 38 Ohio St.3d at 19, 526 N.E.2d at 1357.
In order to bring a successful defective design claim, the plaintiff must establish a prima facie case that 1) the product was defective when manufactured; 2) the defect existed when the product was sold; and 3) the defect was the direct and proximate cause of the injuries or loss. State Farm Fire Cas. Co. v. Chrysler Corp. (1988), 37 Ohio St.3d 1, 6.
The plaintiff's expert testified that the boiler's design was defective because the air pressure switch on the boiler could not detect whether air was actually flowing during the purge stage and because the hinges on the boiler doors were not strong enough to withstand an explosion. According to plaintiff, the system was not purged because the linkage was not attached, and that without the linkage, the shutters could not open to permit air into the system to purge the gas.
In contrast, defendant's expert testified that air was in fact flowing through the system, but that the gas could not escape due to a flue which was wired shut. Defendant's expert also found that the boiler design did in fact detect that the gas-to-air ratio was unbalanced because when the boiler was ignited it showed a yellow raggedy flame instead of a blue flame. He also pointed out that the system shut down approximately four times in response to the imbalance. Furthermore, he stressed that the safety of the boiler was not only dependent on the boiler's mechanisms, but also on the training of the staff operating the boiler.
Defendant's expert also noted that the air pressure switch that was on the boiler was in compliance with industry standards and was approved by the National Fire Protection Agency. Plaintiff's expert even acknowledged on cross-examination that the air pressure switch was in compliance with industry standards.
Regarding the hinges on the boiler doors, the defendant's expert stated that the hinges used were standard and commonly used on boilers of the size at the water treatment plant.
Therefore, the jury had two opposing opinions regarding whether the boiler's design was defective. The Ohio Supreme Court in Pangle v. Joyce (1996), 76 Ohio St.3d 389, 395 held [o]nce expert testimony [is] admitted, it [is] the jury's role to assess the experts' credibility and to assign weight to the experts' testimony and opinions. In the present case, the jury obviously discounted the testimony and opinion of the plaintiff's expert which was within its prerogative. The jury can accept all, a part or none of the testimony offered by a witness whether it is expert opinion or eyewitness fact * * *. McKay Machine Co. v. Rodman (1967), 11 Ohio St.3d 77, 82.
Given the testimony of the defendant's expert, the jury could have concluded that if the staff was properly trained, they would not have proceeded to continually try and light the boiler given the yellow raggedy flame and the repeated shut-down of the boiler, and that the explosion would not have occurred if the staff had checked whether the flue was open. Also, the fact that this boiler, which was twenty years old, was the only boiler of this design to have exploded, most likely affected the weight the jury attributed to the opinion of plaintiff's expert.
The jury could have also attributed less weight to the opinion of the plaintiff's expert given that other witness testimony seemed to support the theory that the explosion occurred due to a closed flue, and not because the linkage fell off.
Because the testimony of defendant's expert and other witnesses support the jury's verdict, we do not find the jury's verdict was against the manifest weight of the evidence.
Plaintiff's fourth assignment of error is overruled.
Judgment is affirmed.
It is ordered that appellees recover of appellants their costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
JAMES D. SWEENEY, P.J., and ANNE L. KILBANE, J., CONCUR
 ____________________________ COLLEEN CONWAY COONEY, JUDGE
[1] Anthony Marks' co-worker, William Wells, was also injured during the explosion and filed a separate suit against the defendants. Wells' case was consolidated with the Marks case and both proceeded to trial together. We, however, only have Marks' appeal before us.